**LAND GRANTORS IN HENDERSON, UNION, and WEBSTER COUNTIES, KENTUCKY and Their Heirs, Claimants,**

v.

**UNITED STATES of America, Defendant.**

**No. 93–648X.**

United States Court of Federal Claims.

Feb. 24, 2009.

---

Nancie G. Marzulla, Marzulla Law, Washington, D.C., with whom was Roger J. Marzulla, Marzulla Law, Washington, D.C., for Claimants. M. Stephen Pitt, Jean W. Bird, and Merrill S. Schell, Wyatt, Tarrant & Combs, LLP, Louisville, Kentucky, Of Counsel.

William J. Shapiro, Environment & Natural Resources Division, United States Department of Justice, Sacramento, CA, with whom was Ronald J. Tenpas, Assistant Attorney General, for Defendant. Martin Cohen, Dale Holmes, and Stephen J. Allison, U.S. Army Corps of Engineers, Of Counsel.

Before the Review Panel, CHARLES F. LETTOW, Judge, Presiding Officer; LAWRENCE S. MARGOLIS, Senior Judge; and LOREN A. SMITH, Senior Judge.

## REPORT OF THE REVIEW PANEL

MARGOLIS, Senior Judge, with whom SMITH, Senior Judge, joins in the Report. LETTOW, Judge and Presiding Officer, dissents to the Report.

On September 20, 1993, the United States Senate referred Senate Bill 794, 103d Cong. (1993) entitled, "A bill [f]or the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs," to the Chief Judge of the United States Court of Federal Claims and instructed the Court to report back to the Senate "giving such findings of fact and conclusions that are sufficient to inform Congress of the amount, if any, legally or equitably due from the United States to the [C]laimants individually" in accordance with 28 U.S.C. §§ 1492 and 2509 (2000). S. Res. 98, 103d Cong. (1993). Senate Bill 794 provides for relief to those individuals that were "promised they would be given priority to repurchase land sold by them if sold by the United States Government" and "paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights." S. 794, 103d Cong. § 2 (1993).

Judge Susan G. Braden, sitting as Hearing Officer in this case, held that "the record provides substantial evidence to support the Claimants' entitlement to the equitable remedy of restitution, at least in the amount of $34,303,980.42." *Land Grantors v. United States*, 81 Fed.Cl. 580, 583 (2008). Following the ruling of the Hearing Officer, the United States and the Claimants filed exceptions to the Hearing Officer's report in accordance with the Rules of the United States Court of Federal Claims ("RCFC"). *See* RCFC App. D, ¶ 7. The Review Panel reviewed the Hearing Officer's report, the briefs filed by both parties, and held a hearing on August 19, 2008, and finds that any payment to the Claimants would be a gratuity.

## DISCUSSION

### 1. Background

In the summer of 1941, after the onset of World War II, the United States ("Government") began condemning land pursuant to the War Purposes Act of 1917, 40 Stat. 241 (codified as amended at 50 U.S.C. § 171) (repealed 1956) in order to establish military training corps throughout the United States. *Land Grantors v. United States*, 81 Fed.Cl. at 582 ("*Land Grantors VI*" or "*Final Report*"). The Government acquired approximately 35,849.28 acres of land in Henderson, Union, and Webster counties, Kentucky to be used for an Army training facility, later named Camp Breckinridge. *Id.* To initiate these condemnations, the Department of War filed five Petitions in Condemnation in the United States District Court for the Western District of Kentucky between 1942 and 1944. *Id.* After the Petitions in Condemnation were filed, the owners of the 491 affected tracts of land had the option to voluntarily negotiate a sale price and sign an option agreement with the United States, or demand a jury trial to determine the amount of "just compensation." *Id.* In total, the Government paid approximately $3.7 million for a fee simple ownership in all of the Camp Breckinridge properties, including those that were purchased under contract and those conveyed under judicial order. *Id.*

After the end of World War II, the United States declared certain facilities on Camp Breckinridge to be surplus property; however, on July 15, 1948, Camp Breckinridge was returned to active status because of the onset of the Korean War. *Id.* at 592. In December 1962, the Department of Defense ("DOD") declared Camp Breckinridge inactive and the land was transferred to the General Services Administration ("GSA") for disposal as surplus property. *Land Grantors v. United States*, 64 Fed.Cl. 661, 665 (2005) ("*Land Grantors I*" or "*First Interim Report*"); *see Land Grantors VI*, 81 Fed.Cl. at 593. Between 1957 and 1967, the GSA leased and sold all of the gas, oil, coal, and other mineral rights underneath the condemned properties, generating millions of dollars of revenue. *Land Grantors VI*, 81 Fed.Cl. at 588–97. In addition, between 1965 and 1972, the GSA

sold most of the Breckinridge properties to the public through auctions. *See Land Grantors I,* 64 Fed.Cl. at 682–84.

In 1965, a former landowner, Cyrus Higginson, filed a lawsuit against the United States in the United States District Court for the Western District of Kentucky. *Id.* at 597–98. That suit was ultimately dismissed by the trial court for lack of jurisdiction: the complaint alleged a violation of the Surplus Property Act of 1944, 58 Stat. 765, which was repealed in 1949. *See id.* at 598. The United States Court of Appeals for the Sixth Circuit upheld the District Court's ruling, stating that the "[G]overnment's title to the land acquired by negotiated purchases vested some 20–30 years ago" and holding that the fee simple title to the condemned tracts "cannot now be disputed under any accepted property theory." *Higginson v. United States,* 384 F.2d 504, 506 (6th Cir.1967). Following the United States Supreme Court's denial of *certiorari* in 1968, a group of landowners formed the Breckinridge Land Committee [1] and sought redress from the United States Congress. *Land Grantors VI,* 81 Fed.Cl. at 598. On April 19, 1993, S. 794 was introduced before the United States Congress, and on October 19, 1993, S. 794 and S. Res. 98 were successfully reported out of the United States Senate and forwarded to the Chief Judge of the United States Court of Federal Claims as a congressional reference. *Id.* at 599.

The current litigation began in this Court on January 12, 1994 with the filing of the initial complaint by the Claimants. Discovery disputes and settlement negotiations occurred for over a decade. *See Land Grantors I,* 64 Fed.Cl. at 685–695. On April 1, 2005, Judge Braden, as Hearing Officer, issued the first Interim Report and Memorandum Opinion. *See generally id.* That report stated that "many of the landowners entered into Contracts with the Government in 1942–1944 with the apparent understanding that they could repurchase their properties after World War II was concluded" but found that any representations by Government employees or agents regarding the Claimants' ability to repurchase their land were unauthorized and therefore, not contractually binding on the Government. *Id.* at 701–03. The report further found that the contracts between the Government and the Claimants were void as they were based on a mutual mistake that "no coal, gas, oil, and other mineral deposits existed under the condemned properties that would support exploration or operation," and noted that restitution is a remedy for contracts based on mutual mistake. *Id.* at 703–09. Judge Braden also found that the doctrine of equitable tolling would stay the statute of limitations because of the *sui generis* circumstances of the case. *Id.* at 711–16. Judge Braden ordered the parties to show cause why the Court should not exercise jurisdiction under 28 U.S.C. § 1491(a)(1) by entering final judgment and staying the issuance of a report on S. 794 under the congressional reference statute. *Id.* at 717–18. On October 3, 2005, the Claimants amended their complaint pursuant to RCFC 15(b) to add a legal claim under the Tucker Act, 28 U.S.C. § 1491(2000) and renewed their equitable claim under 28 U.S.C. § 2509. *Land Grantors VI,* 81 Fed.Cl. at 583. On June 22, 2006, the Hearing Officer issued a Memorandum Opinion and Order granting the Claimants' motion for class certification and holding that RCFC 23, regarding class action suits, was satisfied by a preponderance of the evidence. In 2008, the Claimants' legal claim under the Tucker Act was extinguished by the Supreme Court case, *John R. Sand & Gravel Co. v. United States,* —— U.S. ——, 128 S.Ct. 750, 753, 169 L.Ed.2d 591 (2008) which held that the six-year statute of limitations in the Court of Federal Claims could not be waived based on equitable considerations. *See id.* On April 18, 2008, the Hearing Officer issued a Final Report finding that the Claimants' agreement to sell their land was based on a mutual mistake and awarding the Claimants $34,303,980.42 in restitution. *Id.*

### 2. Standard of Review

Congressional reference cases are referred to the United States Court of Federal Claims

---

[1]. The Government asserts that this committee was formed in 1978. Def.'s ODenin Br. 31. The Hearing Officer concluded that it was formed in 1968. *Land Grantors VI,* 81 Fed.Cl. at 598.

under 28 U.S.C. § 2509. That statute directs a hearing officer to

> [P]roceed in accordance with the applicable rules to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy. 28 U.S.C. § 2509(c).

After the hearing officer rules on the case, the officer "shall append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." *Id.* The phrase "legal claim" simply requires that the claim be based on the invasion of a legal right and be viable in all respects. *J.L. Simmons Co. v. United States*, 60 Fed.Cl. 388, 394 (2004); *see also Spalding & Son, Inc. v. United States*, 28 Fed.Cl. 242, 247 (1993); *Banfi Prods. Corp. v. United States*, 40 Fed.Cl. 107, 121 (1997); *INSLAW, Inc. v. United States*, 35 Fed.Cl. 295, 302 (1996). An equitable claim arises from "an injury occasioned by Government fault" where there is "no enforceable legal remedy," such as where the statute of limitations has run or sovereign immunity bars the suit. *J.L. Simmons Co.*, 60 Fed.Cl. at 394 (citing *Kerr–McGee Corp. v. United States*, 36 Fed.Cl. 776, 786 (1996)). To recover on an equitable claim, a claimant must show (i) that the Government "committed a negligent or wrongful act" and (ii) that the act "caused damage to the [C]laimant." *Id.* (quoting *Cal. Canners & Growers Assoc. v. United States*, 9 Cl.Ct. 774, 785 (1986)). To constitute a "negligent or wrongful act," the Government must violate a standard of conduct established by statute, regulation or a recognized rule of common law, and that violation must damage the claimant. *Id.* (citing *Land v. United States*, 29 Fed.Cl. 744, 753 (1993)). There must be more than a mere error or questionable exercise of Government discretion. *Id.* If, on the other hand, the Government action violates only principles of ethics or morality, that action gives rise to a gratuity. *Id.* at 395; *see also Banfi*, 40 Fed. Cl at 122. If relief would constitute a "mere gratuity," the Court must recommend that Congress deny relief. *Kanehl v. United States*, 38 Fed.Cl. 89, 98 (1997).

After the hearing officer makes a determination on whether the demand is a legal or equitable claim or a gratuity, the findings and conclusions of the hearing officer are submitted to a review panel for review. 28 U.S.C. § 2509(d). "The panel, by majority vote, shall adopt or modify the findings or the conclusions of the hearing officer." *Id.* In reviewing the hearing officer's report, the panel "serves in a role analogous to that of an appellate court." *Kanehl v. United States*, 40 Fed.Cl. 762, 766 (1998) (citing *Bear Claw Tribe, Inc. v. United States*, 37 Fed.Cl. 633, 636 (1997)). The review panel may set aside the factual findings of the hearing officer only if the findings are "clearly erroneous." RCFC App. D, ¶ 8(d). A finding is "clearly erroneous" when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Land v. United States*, 37 Fed.Cl. 231, 234 (1997) (citing *Milmark Services, Inc. v. United States*, 731 F.2d 855, 857 (Fed.Cir.1984)). The hearing officer's legal conclusions are reviewed by the panel *de novo*. *Kanehl*, 40 Fed.Cl. at 766 (citing *Merchants Nat'l Bank of Mobile v. United States*, 7 Cl.Ct. 1, 9 (1984)). Thus, no deference need be given to the legal conclusions reached by the hearing officer. *Land*, 37 Fed.Cl. at 234.

### 3. Conclusions

#### A. Class Action Certification

■ Judge James F. Merow, who acted as Hearing Officer in this case prior to August 15, 2003, issued an order on December 23, 1997 denying plaintiffs' motion to certify this case as a class action. In a well-reasoned order, Judge Merow stated,

> It is concluded that class certification is not feasible in this matter. To the extent that it is necessary to establish the contemporaneous values of the parcels acquired, to compare with the amounts paid, this must be accomplished on the basis of evidence addressed to the most profitable

uses to which the specific land could probably have been put in the reasonably near future. . . . Individual proof as to a claimant's status as a covered individual or heir under the reference is also necessary. A report to the Senate must identify any claimant held entitled to relief and the specific amount determined. . . . Common questions do not predominate to the extent that a class action would be feasible or desirable.

*Land Grantors v. United States,* No. 93–648X (Cl.Ct. Dec. 23, 1997) Order at 2 (internal citations omitted). Judge Braden, as Hearing Officer, reconsidered this matter and on June 22, 2006, granted plaintiffs' motion to reconsider class certification. *See Land Grantors v. United States,* 71 Fed.Cl. 614 (2006). The Hearing Officer determined that Rule 23 of the Rules of the Court of Federal Claims,[2] regarding class action suits, was satisfied. *Id.* With regard to the issue of whether common questions of law and fact predominated, the Hearing Officer stated, "The court, however, is mindful that issues of the precise damages owed to individual members of the proposed class may arise" and "[i]f individual damage determinations is impaired by the existence of a class, the court may de-certify any time before a final judgment." *Id.* at 624–25. The Hearing Officer did not de-certify the class, however, and went on to award approximately $34 million to the class as a whole. *See Land Grantors VI,* 81 Fed.Cl. at 616–17. Upon review of the facts of this case, the Review Panel agrees with the determination made by Judge Merow that this case should not have been certified; the bill, S. 794, requires a determination of an amount, if any, owed to the Claimants individually. *See* S. 794, 103d Cong. § 1 ("The Secretary of the Treasury is authorized and directed to pay . . . to the individuals . . . who sold their land in Henderson, Union, and Webster Counties, Kentucky, to the United States Government under threat of condemnation. . . .").

### B. Senate Bill 794, Section 2(1)

Senate Bill 794 limits relief to those former landowners who were: 1) promised they would be given priority to repurchase land sold by them if sold by the United States; and 2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil, and gas rights. S. 794, 103d Cong. § 2. Based on a review of depositions, affidavits, and answers to interrogatories prepared by former landowners and their heirs, the Hearing Officer determined that S. 794, Section 2(1) was satisfied by a preponderance of the evidence. *Land Grantors I,* 64 Fed.Cl. at 700–02. The Hearing Officer stated, "The court . . . has absolutely no doubt that many of the landowners entered into Contracts with the Government in 1942–1944 with the apparent understanding that they could repurchase their properties after World War II was concluded, and in some cases, at the same price that the Government paid for it or at a discount." *Id.*

The Government argues: 1) the Hearing Officer improperly admitted, and relied on, hearsay evidence in support of her conclusion that S. 794, Section 2(1) was satisfied; and 2) the Hearing Officer's conclusion that S. 794, Section 2(1) was satisfied by a preponderance of the evidence is clearly erroneous. According to the Rules of the Court of Federal Claims, a hearing officer's factual findings shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the hearing officer to judge the credibility of witnesses. RCFC App. D, ¶ 8(d). In this case, the Hearing Officer's findings are not based on any live witnesses; thus, the usual deference given to a hearing officer to judge witness credibility does not apply.

---

**2.** Under RCFC 23, one or more members of a class may sue as representative parties on behalf of all members if: 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequately protect the interests of the class. RCFC 23(a). In addition, the United States must have acted or refused to act on grounds generally applicable to the class; questions of law or fact common to class members must predominate over any questions affecting only individual members; and a class action must be superior to other available methods for fairly and efficiently adjudicating the controversy. RCFC 23(b).

### 1) Hearsay

At the outset, the Government argues that the majority of the evidence relied on by the Hearing Officer was inadmissible hearsay evidence. Specifically, the Government alleges that the 49 affidavits cited by the Hearing Officer in support of her conclusion that the Government made repurchase promises should not have been admitted. The affidavits are hearsay statements under Federal Rule of Evidence ("FRE") 802 [3], but the Hearing Officer admitted the documents under the residual hearsay exception, FRE 807. FRE 807 allows for the admission of hearsay evidence that would be otherwise inadmissible where the evidence has the "equivalent circumstantial guarantees of trustworthiness" as those found in hearsay exceptions FRE 803 and 804. FED. R. EVID. 807. If the court is satisfied with a statement's circumstantial guarantees of trustworthiness, it may then be admitted under the residual exception if:

> [T]he court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of [the Federal Rules of Evidence] and the interests of justice will best be served by admission of the statement into evidence.

*Id.* The proponent of the evidence must also "make[ ][it] known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to meet it. . . ." *Id.* Over strong Government objection, the Hearing Officer held that the affidavits satisfied FRE 807. Evidentiary rulings such as this are reviewed under an abuse of discretion standard. *Shu–Hui Chen v. Bouchard,* 347 F.3d 1299, 1307 (Fed.Cir.2003). A reviewing court shall not disturb an evidentiary ruling unless the decision 1) is clearly unreasonable, arbitrary, or fanciful; 2) is based on an erroneous conclusion of law; 3) rests on clearly erroneous fact findings; or 4) follows from a record that contains no evidence on which the lower court could rationally base its decision. *Id.*

The statements that the Hearing Officer admitted into evidence under the residual exception were affidavits written between 1978 and 1994, approximately 36 to 52 years after the first of the contracts were created. *Land Grantors I,* 64 Fed.Cl. at 700 n. 36. The affidavits were written by a variety of different authors including children, grandchildren, and friends of former landowners. *Id.* In some cases, the affidavits were written by elderly former landowners themselves. *Id.* The only explanation the Hearing Officer provided for admitting the affidavits was:

> [T]he court has determined that the trustworthiness of the affidavits is demonstrated by the totality of the circumstances under which they were executed, *i.e.,* not for litigation, but to persuade members of Congress to pass legislation to compensate the former landowners or their heirs for losses arising from the condemnation of their property in 1942–1944.

*Id.* The Hearing Officer then went on to provide a lengthy list of selected affidavits that the Court considered "credible and reliable." *Id.*

■ Upon examination of the affidavits and the facts surrounding their admission, the Review Panel finds that the affidavits should not have been admitted. As previously mentioned, a court must determine that the statements possess "circumstantial guarantees of trustworthiness" equivalent to that of statements admitted under FRE 803 and 804, prior to admitting hearsay evidence under FRE 807. The following factors are relevant to a court's determination of whether the statements possess such guarantees of trustworthiness:

> [T]he declarant's disinterest, the declarant's motivation to lie, whether the statement was made under oath, the declarant's probable motivation in making the state-

---

**3.** Under the Federal Rules, in the absence of a codified exception, hearsay is inadmissible at trial in the federal courts. FED.R.EVID. 802. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). Any oral or written assertion is a statement. FED.R.EVID. 801(a).

ment, the extent of the declarant's personal knowledge of the events recounted in the statement, the probable accuracy of the witness' recounting of the declarant's statement, a testifying witness's knowledge of the statement's contents, the declarant's age, the declarant's character for truthfulness and honesty, the frequency with which the declarant made similar statements, whether the declarant recanted the statement, and the statement's temporal proximity to the event related.

*See Amcast Industr. Corp. v. Detrex Corp.,* 779 F.Supp. 1519, 1527–28 (N.D.Ind.1991) (citations omitted); Michael H. Graham, Handbook of Federal Evidence § 807:1 (6th ed.2006). An examination of the foregoing factors as applied to the affidavits in this case leaves the Review Panel with the firm conviction that a mistake was committed. First, there is no evidence of the circumstances under which the affidavits were created. *Land Grantors I,* 64 Fed.Cl. at 700 n. 36. Second, the affiants were hardly disinterested parties. In virtually every affidavit cited by the Hearing Officer, the affiant was an individual seeking redress from Congress and had a deep-seated interest in Congress' approval of his or her position; the affiants stood to receive large sums of money and/or mineral rich land from the Government if Congress agreed. This direct interest alone indicates that there were not circumstantial guarantees of trustworthiness. Third, in many cases, the declarant did not have personal knowledge of the events to which he or she averred and was merely repeating rumors or second-hand information. *See, e.g.,* CX 155 (Aug. 17, 1979 Russell Holeman Aff. (stating first option to repurchase land was "second hand information.")); CX 163 (March 15, 1979 Donald L. Bullock Aff. (stating that "[w]e were told by our father that he was told he would be given first chance at buying property back.")); CX 133 (March 1, 1979 James L. Wathen Aff. (stating that he overheard his father state that they would have the first option to buy back the land when the war was over)); CX 204 (March 1, 1979 Thomas Woodring Aff. (stating that "[m]y father, Thomas Woodring, told me that he was told by the government agent that he would be able to repurchase the farm after

the camp was declared surplus.")); CX 212 (Feb. 6, 1979 Anne Luckett Cambron Sanley Aff. (stating only that "[t]he general belief and talk at that time was that the original landowners were to have first chance to repurchase their land taken by the Federal Government for Camp Breckinridge along with the mineral rights.")); CX 216 (Nov. 16, 1979 Samuel W. Steger Aff. (stating that he was in college when his grandfather and parents relayed the story that the heirs could repurchase the land)). Finally, the lack of temporal proximity to the event clearly operates against admission of the affidavits; most of the affidavits were written in 1979, approximately 37 years after the relevant events took place. In consideration of these factors, the Review Panel finds that the affidavits did not have the circumstantial guarantees of trustworthiness to merit the Hearing Officer's reliance on them.

Furthermore, even if the Review Panel supported the Hearing Officer's conclusion that the affidavits have circumstantial guarantees of trustworthiness, there are other requirements for admission. Under FRE 807, the statement must be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Fed. R.Evid. 807(B). In this case, the written record produced at or near the time of acquisition was the best available evidence regarding the parties' intentions, and nothing in the written record supports the affiants' hearsay statements. Additionally, during trial, the Claimants did not present any evidentiary foundation for the affidavits. *See* Trial Tr. at 422–23. Finally, the affidavits were not provided to the Government until 2004, 10 years after the complaint was filed. By that time, all the affiants were deceased, leaving the Government unable to interview the affiants and assess their statements. While the affidavits were provided in advance of trial, they were not provided "sufficiently in advance ... to provide the adverse party with a fair opportunity to prepare to meet [them]" as FRE 807 requires. *See* Fed.R.Evid. 807. Thus, the Review Panel finds that the affidavits do not satisfy FRE 807 and that the

Hearing Officer's admission of them was an abuse of discretion.[4]

### 2) Repurchase Promises

█ In the *First Interim Report*, the Hearing Officer cited 11 depositions, 11 interrogatory responses and 49 affidavits in support of her conclusion that "many" former landowners entered into contracts with the "apparent" understanding that they could repurchase their properties after World War II ended.[5] *Land Grantors I*, 64 Fed.Cl. at 700–02. Even assuming, *arguendo*, the Hearing Officer properly admitted the affidavits, the circumstances surrounding the creation of the cited evidence, and the general deficiency in quantity of evidence, leave the Review Panel with the definite and firm conviction that a mistake has been committed.

For the reasons mentioned with regard to hearsay, the Review Panel finds that the affidavits do not have circumstantial guarantees of trustworthiness and will not place substantial reliance on them. The Hearing Officer also cited 11 interrogatory responses in support of her position that the Government made repurchase promises to the former landowners. The interrogatory responses were signed by heirs in 2004, approximately 63 years after the date of acquisition; none of the interrogatory responses was signed by the actual landowners. The discovery responses are vague, based on hearsay, and merely repeat rumors. *See, e.g.,* DX 675 at 3, 8 (stating that she was a child at the time of purchase and that her parents were told they would have a chance to have first chance to purchase the property once it was sold); DX 679 at 8 ("When I was young my father had mentioned to me that the government had taken the land ...

and that they (the families) were supposed to be able to purchase the land back but this did not happen."); DX 681 at 8 ("I was always told all my life that there was such an arrangement made that the [government] did not live up to, however this all occurred before I was born!"); DX 692 at 8 (Answer to question regarding details of repurchase promise consisted only of: "Through rumor it was a oral promise"); DX 694 at 8 ("In later years I was told by family members 'that promises that owners would be given priority to repurchase' were given to owners"). Indeed, the majority of the interrogatories were nonresponsive with regard to questions requesting detailed information such as the name of the representative of the United States who made such a promise, how that promise was communicated to the original owner, and the date on which that promise was communicated to the original owner. Upon careful review of the interrogatory responses, the Review Panel finds that they add virtually nothing to the body of evidence regarding whether such repurchase promises were actually made and only serve to repeat rumors.

Finally, the Hearing Officer cited 11 depositions in her *First Interim Report*. The cited depositions were taken in July 1995 and October 2004. *Land Grantors I*, 64 Fed.Cl. at 700 n. 35. The deponents were former landowners and Camp Breckinridge workers; their ages at the time the depositions were taken ranged from 77 to 87 years old. *Id.* The Hearing Officer admitted the depositions, over the Government's objection, under the FRE 804. *Id.* That section allows hearsay evidence to be admitted if the declarant is unavailable as a witness and the "[t]estimony [was] given ... in a deposition taken in

---

4. The Claimants assert that the affidavits are admissible under FRE 803(16). *See* Claimants' Resp. Br. at 16. FRE 803(16) is an exclusion from the hearsay rule for "[s]tatements in a document in existence twenty years or more the authenticity of which is established." Fᴇᴅ.R.Eᴠɪᴅ. 803(16). FRE 901(a) states that "the requirement of authenticity or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fᴇᴅ.R.Eᴠɪᴅ. 901(a). The Hearing Officer did not

admit the affidavits under this exception. There is no evidence that the authenticity of the affidavits was, in fact, established, and the Review Panel will not infer authenticity.

5. Although the Hearing Officer found that repurchase promises were made to land grantors, she concluded that such promises were unauthorized and therefore not contractually binding on the Government. *Land Grantors I*, 64 Fed.Cl. at 702–03.

compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." FED.R.EVID. 804(b)(1). In relying on the depositions, the Hearing Officer noted that the Government had an opportunity to cross-examine the deponents, that the deponents were no longer alive or unavailable by reason of health or age, and that each deponent testified in a "cogent and persuasive manner." *Land Grantors I*, 64 Fed.Cl. at 700 n. 35.

The depositions were properly admitted under FRE 804 and provide the most compelling evidence of repurchase promises; nonetheless, the depositions cannot alone stand for the proposition S. 794, Section 2(1) was satisfied by a preponderance of the evidence. The depositions offer vague statements and provide little conclusive evidence regarding the alleged repurchase promises: most of the deponents could not specify a government employee who allegedly promised the former landowners the right of repurchase; many of the deponents were children at the time that the events to which they testified occurred; many testified that they merely overheard conversations whereby a government agent allegedly made such a promise; and the depositions were taken over 50 years after the relevant events occurred, signifying a strong likelihood of faded memories. *See, e.g.*, CX 270 (Sept. 21, 2004 John E. Johnson Dep. at 11, 13 (stating that when he was 10 years old, he overheard a government representative tell his father that his father would be able to buy the land at a fraction of the cost of what the government paid after World War II ended; Johnson also stated "I think fairly well-known throughout the community that, you know, they were going to get their farm back")); CX 269 (Oct. 5, 2004 Robert H. Bruce Dep. at 12, 32 (stating that "[t]he understanding was that the land as such could be repurchased by the original owner when it became available" but that he has never seen anything in writing regarding a right to repurchase)); CX 268 (Oct. 4, 2004 Carl Culver Dep. at 37–39 (stating that his aunt told him "the government was going to take their

farms" but that "[the government agent] promised that they would be able to buy back their land at the price that the government was going to pay them"; Culver was not able to provide specific details such as the exact date that the interaction occurred or the name of the government agent that made the alleged promise)); CX 274 (July 14, 1995 William Caton Dep. at 12–13 (stating that Pete West was one of several Government agents that told him he could buy his property back after the war, but that "they didn't put it in writing")); CX 273 (July 14, 1995 Lottie Lynn Dep. at 10 (stating that a government agent "said we could have [the land] back after the war was over" but providing few other details)); CX 272 (July 13, 1995 William Logan Newman Dep. at 35 (stating that his "impression that [the landowners] would have the first chance to buy [the land] back" was based on "hearsay")); CX 275 (July 14, 1995 Mary Virginia Dixon Dep. at 14, 31 (stating that "after the war was over and they were through with the land, we had first chance to buy it back if we wanted to" but could not remember the name of the government agent she and her husband spoke to)); CX 276 (July 14, 1995 Kathryn Pullman Dep. at 9 (stating that a government representative told her husband that "we would have first chance to buy the land back when they were finished with . . . it" but providing no other details)); CX 271 (Oct. 1, 2004 Peyton Heady at 7–8 (Heady, a Clerk in Mechanical Engineer Department of Camp Breckinridge, stated, "And this land acquisition agent told me . . . these farmers will get their land back after this camp is closed" but could not name the agent with whom he had spoken)).

The depositions of 11 individuals cannot stand for the proposition that all of the approximately 1,000 Claimants in this case have a right to monetary compensation from the Government. Hundreds of tracts of land were purchased by the Government, and only a handful of landowners testified that they were personally promised the right to repurchase their land after World War II ended. Furthermore, none of the alleged repurchase promises were in writing. Indeed, the acquisition documents generated at the time of the

sales indicate that the landowners conveyed a full fee simple interest in the Camp Breckinridge properties to the United States. *See Land Grantors I*, 64 Fed.Cl. at 669. Additionally, the Government's expert witness, Dr. Johnson, testified that "no written confirmation [of the promise] has been found in the legal documentation," and the Claimants have not offered a single piece of evidence generated at or near the time of the sales representing that repurchase promises were made. DX 182 at 65. Based on the foregoing facts, the Review Panel finds that S. 794, Section 2(1) was not satisfied by a preponderance of the evidence and that the Hearing Officer's holding to the contrary was clearly erroneous; the Review Panel is left with the "definite and firm conviction that a mistake has been committed." *See Land*, 37 Fed.Cl. at 234.

### C. Mutual Mistake

The Hearing Officer concluded that the contracts between the Government and the Claimants were void because they were based on a mutual mistake that "no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operation at the time of sale" and awarded the Claimants the equitable remedy of restitution. *Land Grantors VI*, 81 Fed.Cl. at 602, 616. The Government contends that the Hearing Officer's application of the doctrine of mutual mistake is clearly erroneous, challenging the Hearing Officer's factual findings, as well as the legal relevance of the doctrine in this case. The Review Panel reviews the judgments of the Hearing Officer to determine if they are incorrect as a matter of law or otherwise premised on clearly erroneous factual findings. *See Kanehl*, 40 Fed.Cl. at 766; RCFC App. D, ¶ 8(d).

■ "To establish a mutual mistake of fact, [the Claimant] must show that: (1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a

material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking [relief]." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed.Cir.1994); *Land Grantors VI*, 81 Fed.Cl. at 602; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 152(1) (1981). The RESTATEMENT (SECOND) OF CONTRACTS § 151 defines a mistake as a "belief that is not in accord with the facts." "[T]he erroneous belief must relate to the facts as they exist at the time of the making of the contract." *Id.* § 151 cmt. a. The burden of proof is borne by the party attacking the validity of the contract, and that party must present "clear and convincing evidence" of each element before mutual mistake can be found. *See Nat'l Austl. Bank v. United States*, 452 F.3d 1321, 1329 (Fed.Cir.2006); RESTATEMENT (SECOND) OF CONTRACTS § 155 cmt. c (stating that the trier of facts must be satisfied by "clear and convincing evidence" before reformation is granted).

■ The Hearing Officer cited numerous factual findings in support of her conclusion that the 1942–1944 contracts are void because they were based on a mutual mistake, and the Review Panel gives due regard to these factual determinations.[6] *See* RCFC App. D, ¶ 8(d). Notwithstanding our due regard to the Hearing Officer's factual findings, the Review Panel finds that the Claimants did not meet their burden of proving that the contracts should be set aside under the doctrine of mutual mistake.

There is not "clear and convincing" evidence that the contracts were entered into based on an "erroneous belief" of the parties that there was no coal, gas, oil or other minerals that would support exploration or operations at the time of sale, nor that this was a "basic assumption" of the contracts. In fact, there is undisputed evidence that oil was being produced in and around the Breckinridge properties at the time that the contracts were entered into, indicating that the parties had or should have had knowledge of the potential for exploration and operations.[7]

---

**6.** The Review Panel notes that the Government asserts that many of the factual findings the

Hearing Officer relied on are "clearly erroneous."

**7.** The Hearing Officer cited: 1) Dr. Jay L. Brig-

*Land Grantors VI*, 81 Fed.Cl. at 602 n. 16; *see also* DX 183 at 14; DX 182 at DOJ 1853–54. Furthermore, as the Hearing Officer noted, in some cases, both parties were fully aware of the potential for coal, gas, oil or mineral deposits as evidenced by the fact that the landowners had leases with oil and gas companies for operation on their land. *Land Grantors VI*, 81 Fed.Cl. at 605 n. 18; *see also* DX 627; DX 630; DX 633. In those cases, the Government paid for the leases, or an agreement was negotiated with the lessees whereby the lessees could resume activities after the war. *See Land Grantors VI*, 81 Fed.Cl. at 605 n. 18; *see also* DX 627; DX 630; DX 633. Finally, and most telling, the Claimants admitted knowledge in their complaint, alleging, "[a]t and prior to the time of the appraisal and condemnation of the real properties by the agents of the United States, both the property owners and the Defendant either knew or should have known that there existed sub-surface mineral, gas, oil, and/or coal deposits under the properties" and "the aforementioned sub-surface minerals, including gas, oil, and/or coal, were being extracted from some of the real properties as well as surrounding properties." Second Am. Compl. ¶¶ 91–92. Additionally, in their Post–Trial Memorandum, the Claimants noted that coal had been mined in the immediate area since before the Civil War, and that oil and gas drilling was underway before the properties were sold to the United States. Claimants' Post–Trial Br. at 2. Indeed, the Claimants did not allege that there was any mutual mistake until after the Hearing Officer issued her *First Interim Report.*

Even if we assume that some of the contracts were based on a mistaken assumption by the parties, the Claimants have not proved that "the contract did not put the risk of the mistake on the party seeking [relief]." *See Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed.Cir.1994). According to the RESTATEMENT (SECOND) OF CONTRACTS, "[a] party bears the risk of mistake when . . . he is aware, at the time the

contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." RESTATEMENT (SECOND) OF CONTRACTS § 154(b). As previously noted, oil was being produced in Henderson, Union, and Webster counties and some landowners in the area had leases on their land; this should have put the parties on notice that there were deposits of coal, gas, oil or minerals that would support exploration or operation on or near the Camp Breckinridge properties. *See Land Grantors VI*, 81 Fed.Cl. at 605 nn. 16 & 18. Therefore, because the Claimants were "aware that [their] knowledge was limited but undertook to perform in the face of that awareness, [they] bear[ ] the risk of the mistake." RESTATEMENT (SECOND) OF CONTRACTS § 154, cmt. c ("It is sometimes said in such a situation that, in a sense, there was not a mistake but 'conscious ignorance.' "). Moreover, it is generally accepted that where the parties to a transaction fail to recognize the value associated with a purchased item, such as deposits of minerals on a parcel of land, the seller bears the risk. E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 9.3 (3d ed.2004); *Land Grantors VI*, 81 Fed.Cl. at 606; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 154, cmt. a ("it is commonly understood that the seller of farm land generally cannot avoid the contract of sale upon later discovery by both parties that the land contains valuable mineral deposits, even though the price was negotiated on the basic assumption that the land was suitable only for farming. . . ."). In light of the foregoing, the Review Panel finds that the Claimants did not meet their burden of proving, by "clear and convincing" evidence, that the doctrine of mutual mistake applies in this case.

## D. Laches

■ 28 U.S.C. § 2509(c) directs a Hearing Officer to determine facts relating to delay or laches. *See also Kanehl v. United States*, 38 Fed.Cl. 89, 95 (1997). Laches is an

---

ham's testimony that there was evidence of well-defined oil pools located on a map of Union County, even though they were not within the bounds of Camp Breckinridge; that four wells in Webster Country produced a total of 7,075 bar-

rels of oil annually; and 176 wells in Henderson County produced 358,408 barrels of oil annually and 2) Dr. Johnson's testimony that Henderson County produced 365,085 barrels in January 1943. *Land Grantors VI*, 81 Fed.Cl. at 602 n. 16.

equitable defense that rests on consider-ations of fairness. *Id.* at 105 (citing *Acuna v. United States,* 1 Cl.Ct. 270, 279 (1982)). It bars a claim when a plaintiff's "neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1028–29 (Fed.Cir.1992); *see also Kanehl,* 38 Fed.Cl. at 105. As noted by the Federal Circuit:

> Laches is a clement doctrine. It assures that old grievances will some day be laid to rest, that litigation will be decided on the basis of evidence that remains reasonably accessible and that those against whom claims are presented will not be unduly prejudiced by delay in asserting them. Inevitably it means that some potentially meritorious demands will not be entertained. But there is justice too in an end to conflict and in the quiet of peace.

*A.C. Aukerman Co.,* 960 F.2d at 1029 (quoting *Environmental Defense Fund v. Alexander,* 614 F.2d 474, 481 (5th Cir.1980)).

The Hearing Officer determined that the doctrine of laches did not apply "[f]or the same reason, relevant to the court's determination regarding the application of the equitable doctrine of tolling in this case" and found that the Government could not bear its burden of establishing that the delay in bringing suit was unreasonable or that it caused the Government any prejudice. *Land Grantors I,* 64 Fed.Cl. at 717. The Government takes exception to the Hearing Officer's conclusion that the doctrine of laches is inapplicable, as well as the factual findings cited in support of that conclusion. As an equitable defense, laches is committed to the sound discretion of the trial judge and is reviewed by an appellate court under the abuse of discretion standard. *A.C. Aukerman Co.,* 960 F.2d at 1028.

■ To sustain its burden of proving a laches defense, a defendant must demonstrate: 1) an unreasonable and unexcused delay by the claimant in the assertion of a claim, and 2) prejudice to the party against whom the claim is asserted. *See JANA, Inc. v. United States,* 936 F.2d 1265, 1269–70 (Fed.Cir.1991); *Kanehl,* 38 Fed.Cl. at 105; *Acuna v. United States,* 1 Cl.Ct. 270, 279 (1982). Under the first prong, the length of time of delay is measured starting from the time the claimant knew or reasonably should have known about his claim to the date of suit. *See A.C. Aukerman Co.,* 960 F.2d at 1032.

■ The Government sustained its burden of demonstrating an unreasonable and unexcused delay by the Claimants. The Claimants' claim based on the Government's alleged repurchase promises accrued immediately after World War II ended in 1945. The Claimants clearly had knowledge of that claim in 1945, making the delay in bringing suit until 1994 an astounding 49 years.[8] Any claim allegedly arising from the Government's lease and sale of coal, gas, oil, and other minerals accrued at various times between 1957 and 1967, according to the Hearing Officer's undisputed determination. *See Land Grantors I,* 64 Fed.Cl. at 711. Thus, the Claimants knew or should have known by that time of any claims based on the sale of coal, gas, oil, or other mineral deposits.[9] This makes the delay in bringing suit until 1994 between 27 and 37 years. This Court has previously found unreasonable and unexcused delay in significantly shorter amounts time. *E.g., Mexican Intermodal Equip., S.A. de C.V. v. United States,* 61 Fed.Cl. 55, 71–72 (2004) (holding that the delay of 4 1/2 years before submitting a claim to the contracting officer and six years before filing a complaint made the application of the doctrine of laches appropriate); *Kanehl,* 38 Fed.Cl. at 105 (finding delay of 13 years

---

8. The dissent argues that the Claimants' claims accrued in 1963, after the Government declared Camp Breckinridge as surplus property. Even if the relevant period for laches started in 1963, the doctrine of laches applies to the facts of this case.

9. The Hearing Officer's Report does not state the exact time that the Claimants gained knowledge of a cause of action. The Claimants do not dispute knowledge of their cause of action. *See* Claimants' Resp. Br. at 24. The Review Panel therefore assumes that the Claimants had knowledge of their claim by 1967.

from time plaintiff's claim accrued to date of congressional reference bill to be unreasonable); *LaCoste v. United States*, 9 Cl.Ct. 313, 316 (1986) (holding that plaintiff unduly delayed by waiting five years to bring its claim); *Autry v. United States*, 231 Ct.Cl. 271, 276, 684 F.2d 896(1982) (delay of 3 1/2 years after the claim accrued found to be unreasonable); *Acuna v. United States*, 1 Cl.Ct. 270, 280 (1982) (finding a 14-year delay between accrual of claim and introduction of congressional reference bill to be unreasonable).

The Claimants appear to argue that this delay in bringing suit against the Government was not "unreasonable and unexcused" and that they diligently pursued their claim. *See* Claimants' Resp. Br. at 24–25. The Claimants support their argument based on three principal points: 1) they began requesting the return of their land soon after World War II ended; 2) they continued their campaign through the *Higginson* litigation; and 3) they formed the Breckinridge Land Committee in 1968 to pursue their congressional reference case.[10] *Id.* The Review Panel finds these arguments without merit.

Taking the Claimants' first point that they made "numerous requests" for return of their land immediately after World War II, the Review Panel notes that the Claimants cite only two letters in support of their position. *See* Claimants' Resp. Br. at 24 ("On March 15, 1957, two former landowners of this property . . . sent a letter of protest to [Department of the Interior] . . . ."). Moreover, if the Claimants did make numerous requests as they allege, it is unclear why they did not seek any legal redress at that time.[11] Additionally, the *Higginson* litigation cannot be viewed in support of the Claimants' argument that they preserved their claim. A suit by a single landowner cannot

support the Claimants' position that the landowners and heirs who are a part of the present litigation diligently pursued their claims. Furthermore, the Hearing Officer noted that the *Higginson* case was never certified as a class action and that it did not have a preclusive effect on this case; thus, those landowners who were not a part of that action were not precluded from bringing suit under an alternative legal theory. *See Land Grantors I*, 64 Fed.Cl. at 709–10, 714. The Claimants argue that "[w]here the Claimant does not have a meritorious legal claim to bring, his failure to sue will not support a laches defense," noting that suits for unjust enrichment are barred by sovereign immunity in all federal courts. Claimants' Resp. Br. at 23–24. The Panel finds the Claimants' argument to be unpersuasive particularly given the fact that they *filed* a claim under 28 U.S.C. § 1491 on October 3, 2005.

Finally, the formation of the Breckinridge Land Committee by some of the former landowners in 1968[12] does not, standing alone, preserve the Claimants' claim. *See Kanehl*, 38 Fed.Cl. at 105 ("Plaintiff's contention that he contacted persons in Congress during the years 1983 to 1993 in an attempt to bring a congressional reference action does not by itself demonstrate diligent pursuit of plaintiff's claim."). Even if we assume that the formation of the Breckinridge Land Committee by some of the Claimants could preserve a claim for *all* of the Claimants, the Review Panel is not persuaded that the efforts of the Committee constituted a diligent pursuit of the Claimants' claims sufficient to preserve them. The Claimants concede that following the end of the *Higginson* litigation in 1968, the first specific request for a Senate inquiry of this matter "appears to have been" directed to the GSA five years later in 1973. Claimants' Resp. Br. at 25; *see also Land*

10. The Review Panel notes that the test of unreasonable delay is "neglect or delay in *bringing suit*" and not in apprising the opposing party of the claim as the Claimants argue in their response brief. *See* Claimants' Resp. Br. at 24; *A.C. Aukerman Co.*, 960 F.2d at 1028–29.

11. The Government takes exception to the Hearing Officer and the Claimants' conclusions that "numerous requests/petitions were made by the former landowners to repurchase their land after

World War II ended." Def.'s Opening Br. at 32–33. The Review Panel accepts the Hearing Officer's determinations.

12. The Government claims this Committee was formed in 1978 and not in 1968. Def.'s Opening Br. 31. The Hearing Officer determined that the Committee was formed in 1968, and the Review Panel takes that determination as true. *See Land Grantors VI*, 81 Fed.Cl. at 598.

*Grantors VI*, 81 Fed.Cl. at 598. It was not until 1978 that the Breckinridge Land Committee, through the support of a non-profit environmental public interest organization, interviewed the former landowners and Government representatives and searched for records that might support the former landowners' grievances.[13] *Land Grantors VI*, 81 Fed.Cl. at 598. Further, it was not until 1979 that *any* report was sent to *any* member of Congress,[14] and it was not until 1993 that S. 794 was introduced in the Senate.[15] *Id.* at 598–99. Therefore, giving due regard to the factual determinations of the Hearing Officer, the chronology is as follows: the Breckinridge Land Committee delayed at least 10 years from its formation in 1968 in starting to conduct any due diligence on the landowners' claim by interviewing former landowners and searching for records; it delayed 11 years in sending a report to Congress on this issue; and it delayed 25 years in obtaining a resolution from Congress, thereafter filing suit. That delay was unreasonable and unexcused.

 Under the second prong of a laches defense, "prejudice to the adverse party" bars a claim whether it is economic prejudice or evidentiary prejudice. *See JANA, Inc. v. United States*, 936 F.2d 1265, 1269–70 (Fed. Cir.1991); *A.C. Aukerman Co.*, 960 F.2d at 1033. Evidentiary or "defense" prejudice occurs when there is an impairment of the defendant's ability to "present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *A.C. Aukerman Co.*, 960

F.2d at 1033. "[T]he greater the lapse of time in asserting a claim, the less need there is to show specific prejudice to the party against whom the claim is made." *Acuna v. United States*, 1 Cl.Ct. 270, 280 (1982) (citing *Eurell v. United States*, 215 Ct.Cl. 273, 280, 566 F.2d 1146 (1977); *Gersten v. United States*, 176 Ct.Cl. 633, 636, 364 F.2d 850 (1966)).

In this case, most of the relevant events occurred during World War II when the land was transferred to the Government, making much of the pertinent evidence over 50 years old. The Claimants' delay in pursuing their claim resulted in key witnesses, such as Government employees who participated in the acquisition negotiations and the original landowners, being unavailable for deposition or trial testimony. Additionally, some of the evidence cited in favor of the Claimants comes from affidavits of former landowners who had died by the time the Government received the affidavits, thereby making it impossible for the Government to interview the affiants. Furthermore, documents that may have supported the Government's case, such as the original appraisals, were lost. Finally, the memories of those landowners who gave depositions in 1995 and 2004, over 50 years after the relevant events, were faded, thereby undermining the Court's ability to judge the facts.

In their response brief, the Claimants argue: 1) that the Government possessed the documents regarding the transfer of land, and 2) had been on notice that the Claimants were entitled to repurchase their land since the 1940's, and could have prepared affidavits at that time.[16] Claimants' Resp. Br. at 26–

---

**13.** The dissent cites numerous letters written to U.S. Senators, the GSA, and other prominent individuals by a single landowner, Mrs. Ruby Higginson Au, during the years 1968 and 1978. The Review Panel is not convinced that the sporadic letter writing campaign of one individual is sufficient to preserve a claim against the Government.

**14.** "[O]n April 6, 1979 a Report was forwarded to Senator Wendell Ford, Senator Walter Huddleston, Congressman William H. Natcher, and Congressman Carroll Hubbard." *Land Grantors VI*, 81 Fed.Cl. at 598.

**15.** Similar versions of the bill failed to be reported out of the Senate in 1983, 1987, 1989, and 1991. *Land Grantors VI*, 81 Fed.Cl. at 598.

**16.** In support of this claim, the Claimants claim that this case is "remarkably similar" to *Spalding and Son, Inc. v. United States*, 24 Cl.Ct. 112, 153 (1991), where the hearing officer concluded that defendant was prejudiced "primarily [as a] result of its own dilatory conduct and failure to preserve relevant evidence." Claimants' Resp. Br. at 27. In that case, the claimant filed its claims arising from the 1978 execution of a document which gave rise to the claim nine years later, in 1987. On the contrary, in this case, the Claimants' delay in asserting a claim was between 27

27. The Claimants' argument is not persuasive. The Claimants did not bring a claim against the Government until 1994: it was that decades-long delay that resulted in little documentation having been preserved; the unavailability of all key witnesses; and the potential for faded memories of those persons that could testify due to the passage of years. That delay caused evidentiary prejudice to the Government and impaired its ability to assert its defense. Furthermore, the Government was not obligated to prepare its defense without any knowledge of who might file a claim against it and what that claim might be.

In light of the decades-long, unreasonable, and unexcused delay by the Claimants and the prejudice that delay caused to the Government, the Hearing Officer's holding that the doctrine of laches is inapplicable was an abuse of discretion. The Government sustained its burden of proving that the doctrine of laches applies to the facts of this case, barring the Claimants from asserting a claim against the Government.

## CONCLUSION

In sum, the Review Panel finds that the Hearing Officer's determination that Senate Bill 794, Section 2, relating to the Government's alleged repurchase promises, was proven by a preponderance of the evidence was clearly erroneous. Further, the Claimants did not meet their burden of proving that the doctrine of mutual mistake applies to the facts of this case. Finally, the Government met its burden of proving that the doctrine of laches applies, and the Hearing Officer's conclusion to the contrary was an abuse of discretion. In light of the foregoing, the Review Panel recommends that the Chief Judge advise the Congress that the

and 37 years from the time the Government sold the coal, gas, oil, and other minerals and 49 years from the time it acquired the properties. Accordingly, the Review Panel finds this argument without merit.

17. Based on this determination, the Review Panel has not addressed the Claimants' exceptions to the Hearing Officer's report.

1. For several years, this has been the only remaining congressional reference case pending on

Claimants do not have a legal or equitable claim and that any award to the Claimants would constitute a gratuity.[17]

LETTOW, Judge and Presiding Officer, dissenting.

I dissent. The congressional reference in this case requested that the court determine whether individuals who sold their land to the government during World War II for use as a military training camp were entitled to either legal or equitable relief.[1] Concededly, legal relief is not available because the claims involved are barred by the applicable statute of limitations. 28 U.S.C. § 2501. However, the hearing officer concluded that the claimants presented a viable equitable claim, finding that the contracts for sale of land between the government and landowners were based on a mutual mistake that no commercially viable mineral reserves existed on the condemned properties. *Land Grantors v. United States*, 81 Fed.Cl. 580, 602–08 (2008) ("*Land Grantors VI* "). The hearing officer also found that the government's purchasing agents had represented that selling landowners would be given a first opportunity to repurchase their land and that representation had not been honored. *Id.* at 609. She determined that the landowners and their heirs were entitled to restitution from the United States in the sum of $34,303,980.42. *Id.* at 609–11.

A majority of the review panel has concluded that any equitable claim the claimants may have is barred by laches. I respectfully disagree. Laches should not be applied to have preclusive effect where the relevant passage of time was taken up by persistent efforts to persuade Congress to pass the resolution making the reference. In effect, the majority's invocation of laches constitutes

the court's docket. The pendency of such cases provides the rationale for the court's posture as an Article I court that in all other respects hears cases falling within the case-and-controversy requirement of Article III of the Constitution. As this sole remaining case indicates, congressional references to this court have atrophied to the point where, like the Cheshire cat, they have virtually disappeared for all practical purposes. *Cf.* Lewis Carroll, *Alice's Adventures in Wonderland*, 79 (Sterling Publishing Co.2005) (1865).

an inappropriate procedural means to avoid answering the substantive questions posed by the reference in this case.

On the merits, the plaintiffs have a valid equitable claim premised upon representations by the government's purchasing agents that selling landowners would be given a first opportunity to repurchase their land. The majority rejects the hearing officer's findings in this regard but their decision trenches upon her fact-finding role and impermissibly sidesteps the substantial and persuasive evidence in the trial record that supports the hearing officer's finding.

To aid Congress' disposition of this reference, this dissenting opinion analyzes the arguments on review in detail and concludes that an award of restitution should be made to the landowners and their heirs on an individual basis as the reference contemplates.

## FACTUAL BACKGROUND

During the early period of World War II, the federal government acquired approximately 35,684.99 acres in Henderson, Union, and Webster Counties in Kentucky, for the purpose of establishing an Army training facility called Camp Breckinridge. *Land Grantors v. United States,* 64 Fed.Cl. 661, 664 (2005) ("*Land Grantors I*"). The three counties where the government acquired parcels of land are located in the coal-field region of western Kentucky. *See id.* at 677. The vast majority of the property acquired by the government was farmland. *Id.* at 664.

Some of the parcels that the government purchased were subject to lease agreements the owners had entered with oil and gas companies for the exploration and development of possible subsurface oil and gas reserves. DX 538 at DOJ 4111 (Purchased Tracts with Oil and Gas).[2]

The government acquired the land at issue through a series of condemnation proceedings occurring between 1942 and 1944. *Land Grantors I,* 64 Fed.Cl. at 664.[3] After the property was judicially condemned, the landowners had the option of having the purchase price being determined by a jury after trial or negotiating the price with representatives of the federal government. *Id.* The government paid approximately $3,107,341 to acquire the fee simple absolute title for all of the property that is the subject of the instant dispute. *Id.; see also Land Grantors VI,* 81 Fed.Cl. at 582 (finding that the government paid $3.7 million for all of the condemned properties, including properties that arguably are not subject to the congressional reference). The government valued the condemned property "for the highest and best use of agricultural use." Tr. 59:10–11. The declarations of takings do not explicitly state whether the government exercised eminent domain rights over any potential coal, gas, oil, or other mineral reserves that existed underneath the surface of the property. *Land Grantors VI,* 81 Fed.Cl. at 605–06.[4] Rather, the coal, oil, gas and other mineral rights seem to have been subsumed in the overall fee simple title that was taken.

2. Citations to the transcript of the review panel are to "Tr.___." Claimants' exhibits are denoted as "CX," defendant's exhibits are denoted as "DX," and joint exhibits are denoted as "JX."

3. On February 14, 1942, a petition filed under the War Powers Act of 1917 condemned 10,-427.70 acres in Union County, Kentucky. *Land Grantors I,* 64 Fed.Cl. at 668–69. On March 31, 1942, a petition was filed condemning a further 19,517 acres in Union and Henderson Counties. *Id.* at 669. Tracts amounting to 824 acres in Union County were condemned on June 22, 1942, *id.* at 671, and further tracts were condemned later in June 1942, and in July 1942, October 1942, January 1943, April 1943, May 1943, October 1943, and May 1944. *Id.* at 671–72.

4. The government was able to negotiate agreements with the oil and gas companies who held leases for potential subsurface mineral reserves. *Land Grantors I,* 64 Fed.Cl. at 669. Under the agreements, the companies agreed "not ... to exercise any of their rights under their leases for the duration of the war. After the war they will be entitled to exercise these rights." *Id.* at 669 (quoting DX 627 (Letter of Eli H. Brown, Jr., United States Attorney, Western District of Kentucky) (Dec. 4, 1942)). In 1948, however, the government "instituted condemnation proceedings regarding existing oil and gas leases on real properties." *Id.* at 673 (citing *United States v. Leasehold Interest in Oil and Gas Rights in 2,314.14 Acres Situated in Union, Webster, and Henderson Counties,* No. 371 (W.D. Ky., filed Jan. 2, 1948)).

The first condemnation proceeding began approximately two months after the Japanese attack on Pearl Harbor. *Land Grantors I*, 64 Fed.Cl. at 668–69. About 10,000 acres were involved. *Id.* The federal government gave families approximately a month to vacate their properties. *Id.* The short duration between the date of the condemnation and the time landowners had to vacate their property was a common feature of each of the condemnation proceedings. *See, e.g., id.* This expedited takings process combined with the landowners' belief that they were receiving inadequate financial compensation led a group of over 80 owners to send a petition to President Roosevelt on April 22, 1942. *See id.* at 669–70. The Department of the Army launched an investigation and found the landowners' claim of inadequate price to be without merit. *Id.* at 670. However, during its investigation the Department of the Army noted that it "was concerned . . . high pressure methods had been used to persuade some owners to sell." *Id.*

The Department of the Army's investigation found that overreaching, threatening, and abusive methods had been used by the government employees and agents charged with negotiating the final purchase price with landowners throughout the area. *See Land Grantors I*, 64 Fed.Cl. at 670 & n. 11. For the purposes of this case the most salient sale tactic used by the federal government's representatives in acquiring the land at issue was their representation to the landowners that they would be given the right to repurchase their land from the government after the war. *Id.* at 670 n. 11, 700–01 nn. 35–37, 702. In an affidavit, J. Sterling Towles, a former government agent who negotiated purchases on behalf of the government, asserted that the federal government authorized the representations regarding the ability of the landowners to repurchase their land. *Id.* at 670 n. 11. However, the hearing officer concluded that the evidence adduced at trial did not support the finding that the representations were authorized by the government. *Id.* at 702–03. After reviewing the relevant evidence, the hearing officer

nonetheless concluded "that many of the landowners entered into [c]ontracts with the Government in 1942–1944 with the apparent understanding that they could repurchase their properties after World War II was concluded and, in some cases, at the same price that the Government paid for it or at a discount." *Id.* at 702.

Camp Breckinridge was supposed to be declared surplus property at the close of World War II. *See Land Grantors I*, 64 Fed.Cl. at 677. However, the outbreak of Korean War required the government to return Camp Breckinridge to active status. *Id.* at 677. Even after the conclusion of the Korean War, Camp Breckinridge served as a training site for the military until 1959. *Id.*

In 1951, the Department of Defense became aware of the possibility that the condemned properties possessed significant gas and oil reserves. *Land Grantors I*, 64 Fed. Cl. at 664.[5] To safeguard the oil and gas reserves that existed under the condemned property, the Department of the Army transferred management of those reserves to the Department of the Interior. *Land Grantors VI*, 81 Fed.Cl. at 589 (citing JX 4 (16 Fed. Reg. 6132–35) (June 26, 1951)). In 1954, the Department of the Interior was able to confirm that the land comprising Camp Breckinridge contained potentially significant oil and gas deposits. *Land Grantors I*, 64 Fed.Cl. at 673. Subsequently, the government determined that the reserves underneath Camp Breckinridge were being depleted by neighboring wells, and it sought to address that problem by entering into "protective leases" to safeguard those reserves. *Id.*

In 1957, upon learning of the government's plan to lease portions of Camp Breckinridge to private oil and gas companies "to protect the United States against loss by reason of the drainage of the oil and gas deposits," two former landowners and several local officials filed a protest with the Department of the Interior. *Land Grantors I*, 64 Fed.Cl. at 664. The landowners requested that they "receive [their] proportionate part of the roy-

---

**5.** Documentary evidence suggests that the government may have been aware of the potential oil and gas reserves under the condemned prop-

erties as early as 1943. *See Land Grantors VI*, 81 Fed.Cl. at 588.

alty [from the] oil that is produced and sold from the lands formerly owned by us until taken from us by the Government for military purposes." *Id.* at 673 (quoting DX 158 (Letter to Director of Bureau of Land Management (Mar. 14, 1957)) at DOJ 1527–28). Without conducting a formal hearing, the Department of the Interior dismissed the protest because the "Department [of the Interior] has the legal obligation to take such measures as may be necessary to protect the interests of the United States from loss through the extensive drainage of these deposits presently occurring from the Camp Breckinridge lands." *Id.* at 673–674 (quoting DX 40 (Department of Interior Decision Dismissing Protest (Apr. 22, 1957) at DOJ 03111)). The government received royalty payments of $1,833,815.73 from private companies that entered into protective leases with the Department of the Interior. *Id.* at 664.

In 1962, Camp Breckinridge was declared surplus property and was transferred to the General Services Administration for disposal. *Land Grantors I*, 64 Fed.Cl. at 665. In January 1965, the government solicited bids to develop the mineral rights that existed under the properties comprising Fort Breckinridge. *Id.* at 677. The government divided Camp Breckinridge (approximately 36,000 acres) into ten tracts, *id.* at 678, selling the rights to develop the coal, oil, gas, and other mineral reserves for approximately $34 million. *Id.* at 679–80.[6] The government decided to auction off the properties' surface rights at a later date. *Id.* at 678.

Former landowners, upon learning of the government's sale of the mineral rights, realized that the government had gained substantial profits from selling the right to develop the mineral reserves on their former property even though the government had "paid nothing or a *de minimus* amount for existing leases when their land was condemned in 1942–1944." *Land Grantors I*, 64 Fed.Cl. at 665. One former landowner, Cyrus Higginson, initiated a lawsuit brought "on behalf of himself and 'all other former landowners, or heirs, successors, and assigns thereof, of 36,000 acres, namely Camp Breckinridge, in Union, Henderson, and Webster Counties, Kentucky.'" *Id.* at 680. The complaint in *Higginson* alleged violations of the Fifth and Fourteenth Amendments of the United States Constitution as well as claims under the Surplus Property Act of 1944, which had been repealed in 1949. *Id.*[7] The United States District Court for the Western District of Kentucky granted the United States' motion to dismiss, which decision was affirmed on appeal by the Sixth Circuit. *Higginson v. United States*, 384 F.2d 504, 508 (6th Cir.1967). The Supreme Court declined to grant certiorari. *Higginson v. United States*, 390 U.S. 947, 88 S.Ct. 1034, 19 L.Ed.2d 1137 (1968).

At the time the *Higginson* lawsuit was initiated, the government had begun to plan for disposal of the parcels of land surface

---

6. The Tennessee Valley Authority purchased the rights to coal deposits on 30,540 acres for $7,410,000 and later leased the rights to mine those reserves for $400 million. *Land Grantors I*, 64 Fed.Cl. at 679–80.

7. The Surplus Property Act of 1944, 58 Stat 765 (Oct. 3, 1944), was enacted to govern the distribution of the federal government's surplus property, during and after World War II. 58 Stat. 765, 765. Section 23 of the Act governed the disposition of surplus real property. 58 Stat. 765, 777. The Surplus Property Act provided that when disposing of surplus real property, agencies of the federal government would have the first opportunity to acquire the land. Section 12(a), 58 Stat. 765, 770. If federal agencies did not desire to purchase the real property, the opportunity to acquire the property passed to State and local governments and their instrumentalities. Section 23(b), 58 Stat. 765, 777. If the first two

priorities to purchase were not exercised, the government had to provide notice to the former owner of the property that the federal government was going to sell the property and that such a former owner was "entitled to purchase such property, in substantially the identical tract as when acquired from such person, at private sale at any time during the period of ninety days following such notice." Section 23(d)(1)(A), 58 Stat. 765, 777–78. The Surplus Property Act of 1944 contained a sunset provision which provided that the statute would cease to be effective three years after the end of World War II. Section 38, 58 Stat. 765, 784. The relevant portions of the Surplus Property Act of 1944 were repealed effective July 1, 1949, with priorities and preferences for surplus real estate continued until December 31, 1949. *See* 63 Stat. 399 (June 30, 1949), renumbered, 64 Stat. 583 (Sept. 5, 1950).

comprising Camp Breckinridge. *See Land Grantors I*, 64 Fed.Cl. at 682. The Federal Property and Administrative Services Act of 1949 governed that disposal. *Id.* However, prior to the sale of the properties, Congressman William H. Natcher contacted the General Services Administration to inquire about their proposed method of disposing of the properties. *Id.* at 682–83. The General Services Administration responded that it would "afford[ ] former owners an opportunity to reacquire their former holdings at their current fair market value by disposing of surplus property in which there is former owner interest by public sale in parcels following generally the former ownership pattern." *Id.* at 683 (quoting JX 47 (Letter from Howard Greenberg, Commissioner of Utilization and Disposal Service, General Services Administration, to Congressman William H. Natcher (Feb. 5, 1965)) at DOJ 1535). Nonetheless, the government did not follow through on the representations made to Congressman Natcher, as it failed to "afford former owners 'a special notice to bid'" and did not "offer[ ] [property] for sale in parcel size following the former ownership plan." *Id.* at 683. The hearing officer concluded "that the former landowners either did not know their farms could be repurchased or were financially prohibited from bidding, because GSA put the most desirable agricultural properties up for sale in parcels much larger than the size of the original farms." *Id.* at 665. The government received $5,972,950 from auctioning the surface rights of the properties that had comprised Fort Breckinridge. *Id.*

After failing to find redress through the courts or through GSA, "a group of former landowners and/or their heirs formed the Breckinridge Land Committee." *Land Grantors I*, 64 Fed.Cl. at 685. The Committee petitioned Congress for relief. *Id.* The hearing officer found that "[t]he first specific request for a Senate inquiry of this matter appears to have been directed to the GSA by Senator Walter D. Huddleston on or about June 6, 1973." *Id.* In 1978, at the behest of the Breckinridge Land Committee, the Kentucky River Coalition, a non-profit environmental organization, began to interview former landowners and government officials in an effort to memorialize their recollections of the circumstances surrounding the government's acquisition of the properties comprising Camp Breckinridge. *Id.*[8]

In 1983, 1987, 1989, and 1991, Senator Wendell A. Ford of Kentucky introduced resolutions that would have referred the dispute between the government and former landowners to this court; however, each of the resolutions failed to be reported out of the Senate. *See Land Grantors I*, 64 Fed.Cl. at 685. Finally, in 1993, a bill "for the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs" was reported out of the Senate and was forwarded to the Chief Judge of the United States Court of Federal Claims. *See id.*[9] The Senate Resolution provides, in relevant part:

> Section 1. Authorization.
>
> The Secretary of the Treasury is authorized and directed to pay, out of money not otherwise appropriated, to the individuals

---

8. The hearing officer concluded that the Breckinridge Land Committee was formed in 1968. *Land Grantors I*, 64 Fed.Cl. at 685. The government contends that the Breckinridge Land Committee was not formed until 1978. *See* Def.'s Opening Br. in Support of its Notice of Exception at 31 ("Def.'s Opening Br."); Tr. 40:13–14. The government appears to be mistaken in this assertion, however, confusing the formation of the Committee with the fact that the Committee began working with the Kentucky River Coalition in 1978. In all events, there is adequate evidence to support the hearing officer's finding as to the date the Committee was formed.

Notwithstanding the dispute over the date of the Breckinridge Land Committee was formed, both sides acknowledge that Ms. Ruby Higginson

Au and other former landowners had begun taking formal actions no later than 1965, seeking to enforce the government's promise that they would have priority in repurchasing their land. *See, e.g.,* JX 47 (Letter from Congressman William H. Natcher to Alice Reburn (Apr. 30, 1965)) at DOJ 1534; Tr. 40:21–25.

9. The Senate directed the Chief Judge to "proceed ... in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report back to the Senate, at the earliest practicable date, giving such findings of fact and conclusions that are sufficient to inform Congress of the amount, if any, legally or equitably due from the United States to the claimants individually." S. Res. 98, 103d Cong. (1993).

(and in any case in which such individual is deceased, the heirs of such individual) who sold their land in Henderson, Union, and Webster Counties, Kentucky, to the United States Government under threat of condemnation in order to provide the 35,-684.99 acres necessary for the military training camp known as Camp Breckinridge, the sum of $ ___, such sum being in full satisfaction of all claims by such individuals against the United States arising out of such sale.

Section 2. Reason for Relief.

The individuals described in section 1 assert that they were—

(1) promised they would be given priority to repurchase land sold by them if sold by the United States Government; and

(2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil, and gas rights.

S. 794, 103d Cong. (1993).

Claimants filed a complaint in this court on January 12, 1994. Compl. ¶ 1.[10] The initial complaint asserted eight theories of recovery, including alleged violations of both the Due Process and Just Compensation Clauses of the Fifth Amendment. *Land Grantors I,* 64 Fed.Cl. at 685–86. In 1995, the claimants filed a motion requesting the hearing officer to certify the case as a class action. *Id.* at 686. That request was denied several years later. *See* Order of Dec. 23, 1997 at 2–3. In subsequent orders, the hearing officer ruled that the Congressional Reference provided potential relief only for "individuals who sold their land ... to the United States Government under threat of condemnation in order to provide the 35[,]684.99 acres necessary for [Camp Breckinridge]. Claims of individuals who did not sell their lands, despite the threat of condemnation, are clearly not authorized." Order of Nov. 24, 1998 at 5 (internal citations omitted). In addition, the hearing officer concluded that those who had claims premised on statutory rights and title

defects could not assert those claims because they were outside the scope of the Congressional Reference. *See id.* The hearing officer further circumscribed the proceeding by holding that the individuals whose land the government had acquired through declarations of takings or final judgments entered in the condemnation proceedings could not avail themselves of the congressional reference. *See id.* Then, over a period of roughly five years, little, if any, progress was made in bringing the reference to a resolution.

At long last, in September 2004, over ten years after the congressional reference was made, trial was held before a newly assigned hearing officer. Thereafter, the hearing officer issued an Interim Report and Memorandum Opinion on April 1, 2005. *Land Grantors I,* 64 Fed.Cl. at 661. The hearing officer determined that representations made by government employees or agents regarding the ability of the former landowners to repurchase their land were unauthorized and thus could not contractually bind the government. *Id.* at 702–03. The court further held that purchaser contracts between the government and the landowners were void since they were premised on the parties' erroneous belief that no commercially viable mineral reserves existed under the condemned properties. *Id.* at 703–08. Based upon these rulings of mixed law and fact, the hearing officer determined that the former landowners and their heirs were entitled to restitution. *Id.* at 708–17. Rejecting the government's defenses of laches, statutes of limitations, and preclusion, the hearing officer allowed the claimants to file a Second Amended Complaint to conform their allegations to the evidence adduced at trial. *Id.* at 708.

In accordance with the hearing officer's order, the claimants filed a Second Amended Complaint which included a claim of mutual mistake. Second Am. Compl. ¶¶ 32–40. Additionally, the Second Amended Complaint

---

**10.** For a complete overview of the attenuated procedural history of this case, see the hearing officer's prior opinions in *Land Grantors I,* 64 Fed.Cl. at 685–95 (describing the procedural history of the case from its filing in January 1994 to April 1, 2005); *Land Grantors v. United States,* 74 Fed.Cl. 518, 521–23 (*"Land Grantors II "*) (setting out the procedural history from April 1, 2005 to December 14, 2006); *Land Grantors VI,* 81 Fed.Cl. at 599–600 (relating the procedural history from December 14, 2006 to April 18, 2008).

asserted that, apart from the jurisdiction conferred upon the court by the congressional reference, the Tucker Act provided the hearing officer with jurisdiction over the case. Second Am. Compl. ¶ 1.[11] Notwithstanding the hearing officer's prior order denying the claimants' request for class certification, the Second Amended Complaint asserted that the case was a class action. Second Am. Compl. ¶ 6.

Given the claimants' continued insistence that their case was a class action, the hearing officer requested briefing from the parties on whether class certification was appropriate "in light of the 2002 revision of [the] R[ules] [of the] C[ourt] [of] F[ederal] C[laims] 23, the evidence adduced at the trial and thereafter, and the court's ruling that the April 15, 1965 filing of the *Higginson* suit as a class action, even though it was never certified, was sufficient to allow equitable tolling of the statute of limitations." *Land Grantors v. United States*, 69 Fed.Cl. 435, 436–37 (2005) (citing *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). After briefing from the parties, the hearing officer granted the claimants' motion for class certification. *Land Grantors v. United States*, 71 Fed.Cl. 614, 616 (2006) ("*Land Grantors II*"). The hearing officer defined the class as those individuals, or if deceased, the heirs of such individuals:

1. who sold land in Henderson, Union, and/or Webster Counties, Kentucky during 1942–1944 to the Government under the threat of condemnation, pursuant to a contract, in order to provide the 35,684.99 acres necessary to establish the military training camp known as Camp Breckinridge;

2. who executed an Affidavit of Vendor that included the following, or substantially the following, language representing:

That there are no explorations or rentals being paid whatever for the development of coal, oil, gas or other minerals on said lands, that there are no outstanding rights under the terms of any oil, gas, coal or other mineral leases appearing of record for the reason that no rentals under any oil, gas or mineral leases have been paid to those vendors within the past 9 months, nor to any predecessor in title within the past 10 years; that no oil, gas or mineral well was drilled on said premises as provided by the terms of said leases; that oil, gas, or mineral leases are void, and all rights thereunder forfeited for the reason of non-performance on the part of the lessee or his (their) assigns to pay rental, or drill wells according to the terms of said leases, that no exploration for oil, gas or minerals are being conducted on said premises at this time, and that there are no oil wells on said premises; and

3. who were within the prospective class sought to be certified but were not named as a party or in privity to a named party in *Higginson v. United States*.

*Land Grantors II*, 71 Fed.Cl. at 626–27.

In February 2007, the hearing officer issued an Order severing the distinct claims that the claimants had asserted under the jurisdictional grants of the congressional reference and the Tucker Act, respectively. Order of Feb. 28, 2007 at 1. The clerk of the court designated Case No. 93–6481L to encompass the Tucker Act claims. *Id.* However, while this case was still pending before the hearing officer, the Supreme Court issued its decision in *John R. Sand & Gravel Co. v. United States*, —— U.S. ——, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008). A majority of the Supreme Court held that the six-year statute of limitations set forth in 28 U.S.C. § 2501[12] is "absolute ... [and] forbid[s] a

---

**11.** The Tucker Act provides this court with "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a).

**12.** 28 U.S.C. § 2501 provides in relevant part that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within

court to consider whether certain equitable considerations warrant extending a limitations period." *Id.* at 753. In response to the Supreme Court's decision, the hearing officer dismissed the claimants' Tucker Act claims because they were barred by the six-year statute of limitations and equitable tolling was not available to extend the limitations period. *See Land Grantors v. United States,* 80 Fed.Cl. 196, 196–97 (2008) (*"Land Grantors V"*). The hearing officer concurrently lifted the stay that had been placed on the congressional reference case. *Id.* at 197.

The hearing officer issued her Final Report on April 18, 2008, concluding that the terms of the congressional reference enabled those claimants who had sold their property after the filing of the Declarations of Takings to be compensated by the United States. *Land Grantors VI,* 81 Fed.Cl. at 615. However, the hearing officer found that the language of the congressional reference excluded the claims of individuals who had had the value of their land determined through jury proceedings. *Id.* She also denied the claimants' request to eliminate the requirement that an individual produce an Affidavit of Vendor to be included as a member of the class action. *Id.* at 616.

The hearing officer reiterated her finding that the contracts between the former landowners and the government were premised upon a mutual mistake, *Land Grantors VI,* 81 Fed.Cl. at 602–08, and that a restitutionary remedy was appropriate to disgorge the government's gains from selling the rights to minerals which existed underneath their former properties. *Id.* at 608–09. She recommended that Congress appropriate at least $34,303,980.42 to address the claims asserted by the former landowners. *Id.* at 616. To distribute the monetary award, the hearing officer proposed the establishment of a Trust Account with a Trust Officer who would be empowered to verify an individual's status as an heir of a former landowner, calculate the precise amount of each award, and actually distribute the awards to the claimants. *Id.* at 617.

six years after such claim first accrues." 28

## STANDARDS FOR DECISION

In a congressional reference proceeding, "[t]he hearing officer ... shall append to his [or her] findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." 28 U.S.C. § 2509(c). The use in the congressional reference statute of " 'the words "legal claim" ... imply no special meaning beyond the conventional understanding of that term: a claim based on the invasion of a legal right.' " *J.L. Simmons Co. v. United States,* 60 Fed.Cl. 388, 394 (2004) (quoting *Spalding & Son, Inc. v. United States,* 28 Fed.Cl. 242, 247 (1993)). "To qualify as a legal claim, the claim must be viable in all terms—for example, it must not be barred by the applicable statute of limitations or by some other sovereign immunity defense." *Id.* Equitable claims are not subject to this constraint. For a claimant to assert a viable equitable claim in a congressional reference case, he or she must demonstrate "that 'the government committed a negligent or wrongful act' and that 'this act caused damaged to the claimant.' " *Id.* (quoting *California Canners & Growers Ass'n v. United States,* 9 Cl.Ct. 774, 785 (1986)). A claimant has a cognizable equitable claim in a congressional reference case "when a plaintiff has a claim under a statute that is otherwise barred by sovereign immunity, ... when the government acquires benefits through the overreaching of its agents, when government officials act outside the scope of their authority, or when government actions have resulted in unjust enrichment." *Id.*

A review panel shall "by majority vote, ... adopt or modify the findings or the conclusions of the hearing officer." 28 U.S.C. § 2509(d). A review panel has the same relationship with the hearing officer as a panel of a court of appeals has with a district court judge. *See Land v. United States,* 37 Fed.Cl. 231, 233 (1997). Accordingly, the factual findings of the hearing officer "shall not be set aside unless they are found to be clearly erroneous." Rules of the Court of Federal Claims ("RCFC") App. D, ¶ 8(d). A

U.S.C. § 2501.

"[factual] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). The appellant bears the burden of demonstrating that the hearing officer's factual conclusions "are ... clearly erroneous." *See* RCFC App. D, ¶ 8(d). Unlike the deferential review standard employed respecting factual findings, the hearing officer's legal conclusions are subject to *de novo* review. *See, e.g., Pierce v. Underwood*, 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510–11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Overall, the rules of this court provide that "[t]he hearing officer's conclusions shall not be set aside unless justice shall so require." RCFC App. D, ¶ 8(d).

## I. LACHES

The government asserts that any equitable claim to relief that the former landowners and their heirs may have is barred by the equitable defense of laches. Def.'s Opening Br. at 27–36. The equitable defense of laches requires "a showing of '(1) unreasonable and unexcused delay by the claimant, and (2) prejudice to the other party, either economic prejudice or "defense prejudice"—impairment of the ability to mount a defense.'" *Cygnus Corp. v. United States*, 63 Fed.Cl. 150, 154 (2004) (quoting *Mississippi Dep't of Rehab. Servs. v. United States*, 61 Fed.Cl. 20, 30 (2004), and *JANA, Inc. v. United States*, 936 F.2d 1265, 1269 (Fed.Cir.1991)), *aff'd*, 177 Fed.Appx. 86 (Fed.Cir.2006). "[T]he period of delay is measured from when the claimant had actual notice of the claim or would have reasonably been expected to inquire about the subject matter." *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed.Cir.1993). The defendant has the burden of establishing that the two elements of laches have been satisfied. *See id.; Cygnus*, 63 Fed.Cl. at 154. Mere passage of time is insufficient to support a finding that the plaintiff's claims are barred by laches. *United Enter. & Assocs. v. United States*, 70 Fed.Cl. 1, 21 (2006). The deci-

sion of whether the defense of laches is applicable in a given case resides solely within the discretion of the trial court "and should not be made by reference to 'mechanical rules.'" *Id.* (quoting *Aero Union Corp. v. United States*, 47 Fed.Cl. 677, 688 (2000)); *see also Des Moines Terminal Co. v. Des Moines Union Ry. Co.*, 52 F.2d 616, 630 (8th Cir. 1931) (stating that whether laches is applicable "is to be determined by consideration[s] of justice, and that is dependent upon the circumstances of each particular case") (quoted in *Advanced Cardiovascular Sys.*, 988 F.2d at 1161).

In a congressional reference case, the hearing officer is instructed "to determine the facts, including facts relating to delay or laches." RCFC App. D, ¶ 6. The decision of whether the defense of laches applies "is committed to the sound discretion of the [trial] court." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed.Cir.1992) (en banc). In determining whether laches is applicable in a given case the requirements of "undue delay and prejudice ... merely lay the foundation for the trial court's exercise of discretion. Where there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied." *Id.* at 1036. "On appeal the standard of review of the conclusion of laches is abuse of discretion. An appellate court, however, may set aside a discretionary decision if the decision rests on an erroneous interpretation of the law or on clearly erroneous factual underpinnings. If such error is absent, the determination can be overturned only if the trial court's decision represents an unreasonable judgment in weighing relevant factors." *Id.* at 1039.

In *Land Grantors I*, the hearing officer addressed the government's contention that laches barred any equitable claims asserted by the former landowners. 64 Fed.Cl. at 716–17. The hearing officer found that the government was unable to satisfy either of the requirements necessary to invoke laches. *Id.* at 717. The government could not satisfy the first requirement because the hearing officer found that the former landowners had made a diligent effort to reacquire their land.

*Id.* at 713–15. The hearing officer concluded that the government was unable to demonstrate the necessary prejudice because "[i]t was the Government that benefitted from the deaths of most of the original landowners and aging of their heirs." *Id.* at 716.

The government contends that the hearing officer erred in finding that the doctrine of laches was inapplicable in the present case, pointing to the almost 50 year lapse in time between when the complaint was filed and when "[t]he United States acquired the Breckinridge Properties." Def.'s Opening Brief at 28. According to the government's calculations, the "[c]laimants' delay in filing suit ... was no less than 37 years (1957 to 1994) for some claims and no less than 27 years (1967 to 1994) for other claims." *Id.* The government asserts that the claimants have failed to offer an explanation for their long delay or demonstrate that they undertook any meaningful activities which would show a diligent pursuit of their claims against the United States. *Id.* at 29. As the government would have it, the hearing officer avoided the application of laches only by relying on clearly erroneous factual findings and conclusions that were "irrelevant to the possible application of the doctrine of laches." *Id.* at 31, 35.

The government avers that the delay in bringing suit prejudiced it because "original eyewitness testimony of the acquisition events, if available at all, was more than 50 years old" and that the necessary documents to sustain its defenses "are no longer available, in all probability having been destroyed years ago in accordance with standard Army record retention policies." *Id.* at 29–30. Additionally, the government claims "[t]he unavailability of witnesses is especially prejudicial to the United States in this case, where

the [o]fficer's findings are based on allegations that were generated decades after the relevant events." *Id.* at 29–30.

The government's argument that the hearing officer erred in finding laches inapplicable in the present case is unavailing. The hearing officer correctly determined that the government is unable to satisfy either of the two requirements necessary to invoke the defense of laches. The government's reliance on the time period that other cases have found satisfactory to invoke the defense of laches is misguided because "[n]o fixed boundaries define the length of time deemed unreasonable, and the duration should be viewed in light of the circumstances." *Aero Union Corp.*, 47 Fed.Cl. at 686. The approach to laches which the government wishes the review panel to embrace, and which the majority has adopted, would have deleterious consequences for future congressional reference cases because it would " 'add to [the] rigor [of suing the sovereign] by refinement of construction where consent has been announced.' " *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 383, 70 S.Ct. 207, 94 L.Ed. 171 (1949) (quoting *Anderson v. Hayes Constr. Co.*, 243 N.Y. 140, 153 N.E. 28, 29–30 (1926) (Cardozo, J.)).

The government is unable to show that the claimants did not diligently pursue their claims against the United States. The former landowners' claims against the United States only matured in 1963, after the government had declared Camp Breckinridge surplus property.[13] Following the government's decision to declare Camp Breckinridge surplus property, several former landowners made inquires about repurchasing their land from the Federal Government. *See* JX 47 (Letter from Congressman Wil-

---

**13.** Even if the relevant period to measures laches is from the end of World War II, as suggested at one point during oral argument, Tr. 42:15–18, the hearing officer determined "that numerous requests/petitions were made by former landowners to repurchase their land after World War II ended." *Land Grantors I*, 64 Fed.Cl. at 713; *see also* JX 36 at DOJ 1500 (Letter from Senator Virgil Chapman to Robert D. Griggs, et. al.) (Apr. 11, 1950) ("I am glad to have your comments on the subject of the rightful claim of former land owners to a priority in the reacquisition of the land embraced in Camp Breckinridge.

I have had ... other communications on this subject"). Furthermore, the government's response to requests to buy the property comprising Camp Breckinridge demonstrates that the relevant period for measuring delay would be after Camp Breckinridge had been declared surplus property. *Land Grantors I*, 64 Fed.Cl. at 713 n. 52 (stating that the government's response to inquiries about the ability to purchase the parcels comprising Camp Breckinridge after World War II "was that the 'property has not as yet been declared surplus' ").

liam Natcher to Mrs. Alice Raeburn (Apr. 30, 1965) at DOJ 1534) (noting that many former residents had "requested General Services Administration to either permit them to repurchase at the same figure as when the reservation was obtained, or to be granted preferential rights in regard to bids on specific property"); JX 48 (Letter from Lawson B. Knott, Administrator, General Services Administration, to Congressman Edward J. Gurney (Jan. 18, 1965)). Prior to commencing the auctions for the Camp Breckinridge properties, the General Services Administration received letters from members of Congress inquiring about the government's plans for disposing of the parcels, given the promise made to the former landowners that they would have the first opportunity to repurchase their land. *See Land Grantors I*, 64 Fed.Cl. at 682–83. The General Services Administration stated that it would accommodate former landowners "by disposing of surplus property in which there is former owner interest by public sale in parcels following generally the former ownership pattern." JX 47 (Letter from Howard Greenberg, Commissioner of Utilization and Disposal Service, General Services Administration, to Congressman William H. Natcher (Feb. 5, 1965)) at DOJ 1535. Despite the inquiries made by the former landowners and by congressional representatives on their behalf, they were unable repurchase their land from the government because "the former landowners either did not know their farms could be repurchased or were financially prohibited from bidding, because GSA put the most desirable agricultural properties up for sale in parcels much larger than the size of the original farms." *Land Grantors I*, 64 Fed.Cl. at 665.

In 1964, upon learning that the former land had been declared surplus property by the government, former landowners and their heirs formed the Breckinridge Land Committee. Dep. of Carl Culver (Oct. 4, 2004), Ex. 5 (Significant Events of Camp Breckinridge); *see also* Dep. of Katherine Pullum (Aug. 14, 1995), Ex. 3 (Letter to the Contributors of Breckinridge Land from Mrs. Byron Tapp). The Breckinridge Land Committee was dedicated to reacquiring the properties that were sold to the government

in the 1940s and receiving additional financial compensation for the oil and gas reserves that existed under their former properties. JX 57 (Letter from Ruby Higginson Au to Senator Marlow Cook (Feb. 18, 1974)) at DOJ 1565. The Breckinridge Land Committee was managed by an executive committee that was comprised of Cyrus Higginson, Sam Fellows, A.G. Pritchett, R.W. Roberts, and Byron Tapp. Dep. of Katherine Pullum (Aug. 14, 1995), Ex. 3 (Letter to the Contributors of Breckinridge Land from Mrs. Byron Tapp). Most of the former landowners were actively involved in the Breckinridge Land Committee and in the *Higginson* lawsuit, which was filed in 1965. Dep. of Mildred Wood Watson (Oct. 1, 2004), 10:5–7.

On April 15, 1965, in response to the government's failure to honor the repurchase representations made to the former landowners and its unwillingness to follow through on the representations made to Congressman Natcher, a lawsuit was instituted on behalf of Mr. Cyrus Higginson "and all other former landowners, or heirs, successors and assigns thereof, of 36,000 acres, namely Camp Breckinridge, in Union, Henderson and Webster Counties, Kentucky." DX 64 (Compl. at 2, *Higginson v. United States*, Civil No.2074 (Apr. 15, 1965)) at DOJ 1069; *Land Grantors I*, 64 Fed.Cl. at 680. The complaint asked for the case to be certified as a class action under Fed.R.Civ.P. 23(b). DX 64 (Compl. at 2, *Higginson v. United States*, Civil No.2074) at DOJ 1069; *Land Grantors I*, 64 Fed.Cl. at 680. However, the District Court for the Western District of Kentucky never ruled on the request of class certification because it dismissed the case for failure to state a claim. DX 64 (Motion for New Trial at 1, *Higginson v. United States*, Civil No.2074 (Aug. 12, 1965)) at DOJ 1209. Mr. Higginson appealed the district court's decision to the Sixth Circuit, which affirmed the dismissal. *Higginson v. United States*, 384 F.2d 504, 506 (6th Cir.1967). In 1968, the Supreme Court declined to grant a writ of certiorari to hear the case. *Higginson v. United States*, 390 U.S. 947, 88 S.Ct. 1034, 19 L.Ed.2d 1137 (1968).

In response to the inability to get relief through the judiciary, the Breckinridge Land

Committee ceased formal activities until it decided what other alternative avenues for redress existed. Dep. of Carl Culver, Ex. 5 (Significant Events of Camp Breckinridge). Despite this hiatus, individual members of the Breckinridge Land Committee continued to seek relief for the former landowners and their heirs. *See, e.g.,* Tr. 40:23–25; Dep. of Carl Culver, Ex. 5 (Significant Events of Camp Breckinridge) at 2. The primary advocate for the former landowners and their heirs was Mrs. Ruby Higginson Au. Mrs. Higginson undertook an extensive letter writing campaign, writing repeatedly to her senators, President Nixon, the General Services Administration, Senator Sam Ervin, the governor of Kentucky, and Chief Justice Burger. *See, e.g.,* CX 12 (Letter from Walter Moreland, on behalf of President Nixon, to Mrs. Harvin Au (Apr. 9, 1969)) at BLC 1188; CX 10 (Letter from Curtis A. Roos, Assistant Commissioner for Real Property Disposal, General Services Administration, to Mrs. Harvin Au (Apr. 23, 1969)) at 1180; CX 20 (Letter from Arthur G. Christean, Deputy Clerk, Supreme Court of the United States to Ms. Ruby Higginson (May 29, 1973)) at BLC 1196; CX 21 (Letter from Mortimer J. Stamm, Legal Assistant to the Governor, to Mrs. Ruby Higginson Au (May 24, 1973)) at BLC 1197; CX 20a (Letter from Senator Walter D. Huddleston to Mrs. Harvin Au (May 30, 1973)) at BLC 1196; CX 52 (Letter from Senator Sam J. Ervin, Jr. to Mrs. Harvin Au (Mar. 8, 1974)) at BLC 1212; CX 23 (Letter from Senator Marlow W. Cook to Mrs. Ruby Au (Mar. 29, 1974)) at BLC 1216. In addition to her extensive letter writing campaign to government officials, Mrs. Higginson Au wrote letters to newspapers and magazines in an effort to interest them in investigating the situation surrounding the acquisition and disposal of the properties that comprised Camp Breckinridge. *See* Tr. 40:24.

The efforts of Mrs. Ruby Higginson Au's letter writing campaign were rewarded when Senator Walter D. Huddleston agreed that it was appropriate for him to make an "an inquiry to the General Services Administration." CX 22 (Letter from Senator Walter D. Huddleston to Mrs. Harvin Au (June 6, 1973)) at BLC 1198. Subsequently, Senator Marlow W. Cook also agreed to take up the former landowners' cause with the General Services Administration. *See* CX 23 (Letter from Senator Marlow W. Cook to Mrs. Ruby Au (Mar. 29, 1974)) at BLC 1216. Despite the intervention of two senators, GSA responded that the matter had been settled when the Supreme Court failed to exercise jurisdiction over the *Higginson* lawsuit. *See* JX 54 (Letter from Allan G. Kaupinen, Assistant Administrator, General Services Administration, to Senator Walter D. Huddleston (June 20, 1973)) at DOJ 1543. Notwithstanding the rejection from GSA, Mrs. Higginson Au continued to press the former landowners' grievances with Kentucky's senators. *See, e.g.,* JX 56 (Letter from Ruby Higginson Au to Senator Walter D. Huddleston (July 10, 1973)) at DOJ 1559. Finally, in April 1974 Senator Cook committed his "staff to investigate the possibilities of obtaining some kind of congressional commitment" to redress the wrongs committed by the federal government in acquiring and disposing of the property that comprised Camp Breckinridge. CX 24 (Letter from Senator Marlow W. Cook to Ruby H. Au (Apr. 19, 1974)) at BLC 1217.

After receiving the commitment from Senator Cook, Mrs. Higginson Au continued to lobby members of Kentucky's congressional delegation on behalf of the former landowners and their heirs. *See, e.g.,* CX 34 (Memorandum from Breckinridge Land Committee to Congressman Carroll Hubbard (Apr. 6, 1979)) at BLC 1370; DX 174 (Letter from Paul Goulding, Deputy Administrator, General Services Administration, to Congressman Romano Mazzoli (Oct. 25, 1976)) at DOJ 1574. In 1976, in an effort to further publicize the plight of the former landowners, Mrs. Higginson Au published a book chronicling the government's actions and how the former occupants of the land had been wronged. CX 8 (Ruby Higginson, *Land of Camp Breckinridge: Injustice to the Farmer* (1976)). In response to the efforts of Mrs. Higginson Au and Kentucky's congressional delegation, the Breckinridge Land Committee resumed an active role in seeking to further the former landowners' interests. *See* JX 57 (Letter from Ruby Higginson Au to Senator Marlow Cook (Feb. 18, 1974)) at

DOJ 1565 ("The Breckinridge Land Committee is seeking public support for a Senate [i]nvestigation in the condemnation and disposition of Camp Breckinridge."). In preparation for a congressional reference to this court, the Breckinridge Land Committee worked in partnership with the Kentucky River Coalition to record the recollections of eyewitnesses to the circumstances surrounding the government's acquisition of property for Camp Breckinridge. *Land Grantors I,* 64 Fed.Cl. at 685.

In 1979, as a result of the efforts of Mrs. Higginson Au, Senators Walter Huddleston and Wendell Ford introduced a resolution referring the instant dispute to this court. 125 Cong. Rec. S33608–10 (Nov. 27, 1979). Although their efforts in 1979 to have the former landowners' claims against the United States referred to this court failed, Senator Ford continued to introduce the resolution in every Congress until the Senate passed the measure in 1993. 140 Cong. Rec. S15235–04 (Nov. 30, 1994).

The government is unable to establish that the delay in filing suit was unexcused because the former landowners' only option was to pursue relief through Congress and the political process. It is well established that sovereign immunity bars suits against the United States, unless the federal government has consented to being sued. *See United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). At oral arguments before the review panel, a member of the panel suggested two possible alternatives to seeking a congressional reference: filing suit under the Federal Tort Claims Act for misrepresentation or suing the United States on an implied contract in this court. Tr. 89:8–13, 90:13–14. However, the claimants could not avail themselves of the two suggested approaches. First, an action brought under the Federal Tort Claims Act on a tort theory of misrepresentation is barred because it would fall within an exception to the Federal Tort Claims Act contained in 28 U.S.C. § 2680(h).[14] The Supreme Court has interpreted this exception

to the waiver of sovereign immunity contained in the Federal Tort Claims Act broadly to preclude suit against the United States when an individual relies on the statements of a government agent or employee. *See United States v. Neustadt,* 366 U.S. 696, 702–703, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961) (holding that 28 U.S.C. § 2680(h) barred the plaintiff's suit against the United States which arose out of his reliance on a inaccurate Federal Housing Administration inspection and appraisal in purchasing a home). Secondly, this court's jurisdiction does not allow it to entertain claims against the United States premised upon a theory of unjust enrichment. *See Merritt v. United States,* 267 U.S. 338, 340–41, 45 S.Ct. 278, 69 L.Ed. 643 (1925) (stating "[t]he Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law"). Thus, the claimants had no alternative but to rely on Congress to provide them with a means of redress.

The government additionally is unable to demonstrate that it has suffered the necessary prejudice to invoke the defense of laches. The government makes the specious claim that it was unduly prejudiced by the unavailability of witnesses because the claimants' allegations are fabrications "that were generated decades after the relevant events." Def.'s Opening Br. at 29–30. The allegations of governmental wrongdoing in the instant case date to 1942. *See Land Grantors I,* 64 Fed.Cl. at 670. One of the main concerns that was contemporaneously brought to the attention of the federal government was that "high pressure methods had been used to persuade some owners to sell." *Id.* A tactic employed by government purchasing agents was to promise the owners of the property that they would have the first right to repurchase their land when the government no longer had any use for it. *Id.* at 670 n. 11, 701–02. In *Higginson,* the plaintiff specifically alleged "that at the time of their con-

---

**14.** The relevant provision of the Federal Tort Claims Act states that it "shall not apply to ... (h) [a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prose-

cution, abuse of process, libel, slander, *misrepresentation,* deceit, or interference with contract rights" (emphasis added). 28 U.S.C. § 2680(h).

veyance of their properties, and as a part of the consideration therefor, the then owners were informed by government agents and employees that they would have the right and opportunity to repurchase their lands." *Higginson,* 384 F.2d at 506.[15] Claims that the government agents engaged in overreaching have existed since the United States first began acquiring the land to establish Camp Breckinridge in 1942. Thus, the historical record undermines the government's contention that the unavailability of witnesses in this case is debilitating to its defense because of the recent nature of the allegations in this case. The government first had the opportunity to investigate claims relating to the representations made to the landowners in 1942 and thus it had sufficient notice of the pending claims for it not to be prejudiced by the congressional delay in enacting the instant reference.

The government's claim of prejudice premised upon the "fad[ing] memories" of those who were firsthand witnesses of the event, Def.'s Opening Br. at 30, suffers from the same flaw as its prior argument in that it conveniently overlooks and ignores the historical record of this case. Notably, the Breckinridge Land Committee and the Kentucky River Coalition sought to memorialize the testimony of former landowners and government officials 16 years *before* the complaint was filed in this case. *Land Grantors I,* 64 Fed.Cl. at 685. Those activities significantly undermine the government's claim of prejudice as well as the ample notice that the government had regarding the possibility of litigation surrounding the acquisition and disposition of the properties comprising Camp Breckinridge. Furthermore, the hearing officer concluded that "[i]t was the Government that benefitted from the deaths of most of the original landowners and aging of their heirs." *Land Grantors I,* 64 Fed.Cl. at 716.

Equally unavailing is the government's claim that the destruction of certain documents and its inability to locate other potentially relevant documents is sufficient to demonstrate the necessary prejudice. The hearing officer concluded that the government was not prejudiced by the loss of documents, but rather that it "benefitted from the destruction of documents through agency retention programs." *Land Grantors I,* 64 Fed.Cl. at 716. Furthermore, granting relief to the United States on the grounds that it was prejudiced by the unavailability of documents would run afoul of a central tenet of equity that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). In the instant matter, the United States continued to dispose of documents relevant to the claimants' allegations after having received a document request from claimants. *Land Grantors I,* 64 Fed.Cl. at 716. Thus, finding the necessary prejudice to satisfy laches due to the government's destruction of documents would reward the government's unjust conduct. Additionally, support for rejection of the government's argument is found in the fact that Congress was giving voice to the principle "that every right, when withheld, must have a remedy, and every injury its proper redress." *Marbury v. Madison,* 5 U.S (1 Cranch) 137, 147, 2 L.Ed. 60 (1803).

In the instant matter, the government is unable to show that the hearing officer's decision that laches was inapplicable was an abuse of discretion. The government has been unable to demonstrate how the claimants' delay in this case was unreasonable or inexcusable. Furthermore, the government failed to demonstrate that the hearing officer's conclusion that the government was not prejudiced by fading memories, missing documents, and the unavailability of firsthand witnesses was clearly erroneous. In short, the hearing officer's decision rejecting the government's claim of laches is fully supportable. It assuredly does not "rest[ ] on an erroneous interpretation of the law or on clearly erroneous factual underpinnings," *A.C. Aukerman Co.,* 960 F.2d at 1039, con-

---

**15.** It should also be noted that Mr. Higginson asserted "that [the former landowners] were denied the right to prove the value of mineral rights at the time of the condemnation proceedings, and specifically claims that the government's acquirement of those rights constituted a taking without payment." *Higginson,* 384 F.2d at 506.

trary to the majority's less than detailed analysis.

## II. ELIGIBLE CLAIMANTS

The hearing officer's final opinion and order addressed whether she should grant the claimants' motion to vacate an order entered by the first hearing officer, which concluded that the terms of congressional reference applied only to "those landowners who 'sold' their properties prior to the filing of declarations of taking." Pls.' Mot. to Vacate Nov. 24, 1998 Order at 1. The claimants requested that the hearing officer allow "all former landowners of Camp Breckinridge property (or their heirs) ... to participate in any legislative award." *Id.* at 2. The hearing officer decided to vacate the November 24, 1998 order because "it improperly foreclose[d] claims of landowners or their heirs who sold their property after the issuance of the Declarations of Taking." *Land Grantors VI*, 81 Fed.Cl. at 615. However, after examining the congressional reference, the hearing officer rejected the claimants' effort to include all former landowners because the congressional reference's "plain language ... limits the scope of the reference to claims from landowners who sold their property to the Government, and does not include claims of landowners whose property was acquired through jury proceedings." *Id.*

Both parties contest an aspect of these rulings by the hearing officer. On the one hand, the claimants challenge the hearing officer's conclusion that not all of the former landowners and their heirs were entitled to be compensated under the terms of the congressional reference. Claimants' Opening Br. at 14–18. The claimants assert that the hearing officer's interpretation of the congressional reference "is at odds with the plain language and rationale of Section 2, which demonstrates Congress' intention to provide compensation for all ... the former owners of all 35,684.99 acres necessary to create the military training camp known as Camp Breckinridge." *Id.* at 15. The claimants contend the hearing officer's interpretation was the result of her "read[ing] out 'threat of condemnation' from the reference"

and "adopt[ing] a far-too-restricted definition of 'sold.' " *Id.* at 15, 17.

On the other hand, the government objects to the hearing officer's conclusion that the congressional reference "does not foreclose [c]laimants who sold their property subsequent to the filing of Declarations of Taking" from partaking in any recovery in this case. *Land Grantors VI*, 81 Fed.Cl. at 614–15. The government asserts that the hearing's officer conclusion is flawed because it "requires a strained reading of the word 'sold,' and results in the non sequitur that S. 794 was intended to cover individuals whose property was 'condemned ... under threat of condemnation' " and "is inconsistent with the plain terms of S. 794." United States' Resp. to Claimants' Opening Br. at 9 ("Def.'s Resp.").

When engaging in statutory interpretation, a court's inquiry "begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC. v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004); *America Online, Inc. v. United States*, 64 Fed.Cl. 571, 577 (2005) ("In cases of statutory interpretation, courts first examine the plain meaning of the statute, and, if it is unambiguous, enforce that meaning."). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). In interpreting a statute, a court should endeavor to give effect to " 'every clause and word of a statute.' " *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (quoting *Inhabitants of Montclair v. Ramsdell*, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883)). However, the canons of statutory interpretation "are not mandatory rules" and "are designed to help judges determine the Legislature's intent as embodied in particular statutory language." *Chickasaw Nation v. United States*, 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001).

In light of these principles of statutory construction, the claimants' objections are unavailing. The congressional reference

provides that the federal government may compensate those "individuals (and in any case in which such individual is deceased, the heirs of such individual) who sold their land in Henderson, Union, and Webster Counties, Kentucky, to the United States Government under threat of condemnation in order to provide the 35,684.99 acres necessary for the military training camp known as Camp Breckinridge." S. 794, 103d Cong. § 1 (1993). The claimants assert "that the word 'sold' in the reference is intended to mean condemnation" because the terms of the congressional reference "do[ ] not exclude any landowner who owned land ... necessary for Camp Breckinridge." Claimants' Opening Br. at 15, 17. However, the inclusion of the phrase "under threat of condemnation" serves as a limitation on which former landowners may recover. The reading proposed by the claimants would turn the phrase "under threat of condemnation" into mere surplusage. The plain meaning of the congressional reference flatly contradicts the claimants' contention that all former landowners and their heirs are entitled to partake of any recovery irrespective of how the United States acquired their property.

The government's challenge to the hearing officer's construction of the congressional reference also must be rejected. The government's argument rests upon the premise that the filing of a declaration of taking is synonymous with condemnation. *See* Def.'s Resp. at 9. However, this premise is not always correct. The government's argument ignores the fact that title to the government vests only upon the government's paying the former landowners compensation, *see Albert Hanson Lumber Co. v. United States*, 261 U.S. 581, 587, 43 S.Ct. 442, 67 L.Ed. 809 (1923), or depositing the appropriate funds with the district court in accord with the provisions of the Declaration of Taking Act. *United States v. Dow*, 357 U.S. 17, 23, 78

S.Ct. 1039, 2 L.Ed.2d 1109 (1958).[16] The passage of title is critically important. Absent passage of title, a "taking" can occur under the Fifth Amendment. For example, "if the United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking." *Dow*, 357 U.S. at 22, 78 S.Ct. 1039. Conversely, under the Declaration of Taking Act "when the Government files a declaration before it has entered into possession of the property filing constitutes the 'taking.'" *Id.* at 23, 78 S.Ct. 1039. In this instance, those individuals who sold their land to the government after the filing of a declaration of taking but before payment of compensation satisfy the terms of the congressional reference because they retained the title to their property and the selling price was negotiated outside the judicial condemnation process. If the government and the former landowner failed to reach a negotiated agreement on an appropriate price for the property the government had the option to resort to a judicial determination of price. Thus, individuals who sold their land to the government after filing of the declaration of taking satisfy the congressional reference's requirement that their land have been "sold ... under threat of condemnation." S. 794.

Furthermore, reading the congressional reference as a whole, it becomes apparent that the government's construction would inextricably sever the two sections of the congressional reference. The congressional reference was enacted because the former landowners and their heirs asserted that the government "(1) promised they would be given priority to repurchase land sold by them if sold by the United States Government; and (2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights." S. 794, 103d Cong. § 2 (1993). The government's

---

**16.** As the Supreme Court observed in *Albert Hanson Lumber*, "[t]he owner is protected by the rule that title does not pass until compensation has been ascertained and paid, nor a right to the possession until reasonable, certain and adequate provision is made for obtaining just compensation." 261 U.S. at 587, 43 S.Ct. 442 (citing *Backus v. Fort Street Union Depot Co.*, 169 U.S. 557, 568, 569, 18 S.Ct. 445, 42 L.Ed. 853 (1898); *Bauman v. Ross*, 167 U.S. 548, 598, 599, 17 S.Ct. 966, 42 L.Ed. 270 (1897); *Cherokee Nation v. Southern Kansas Ry.*, 135 U.S. 641, 659, 10 S.Ct. 965, 34 L.Ed. 295 (1890); *United States v. Jones*, 109 U.S. 513, 518, 3 S.Ct. 346, 27 L.Ed. 1015 (1883); and *Mississippi & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 406, 25 L.Ed. 206 (1878)).

proposed construction of the congressional reference would deprive the second section of the congressional reference of any meaning because it would prevent those of the former landowners and their heirs who have satisfied each of the two reasons for enactment of the congressional reference, from being compensated by the United States.

The claimants also challenge the hearing officer's determination that the former landowners and their heirs are required to produce an affidavit of vendor to partake in any recovery. Claimants' Opening Br. at 18–19. The hearing officer found that such an affidavit was a necessary predicate "for class definition and notice" "[s]ince [c]laimants' claim arises from a mutual mistake material to the 1942–1944 contracts." *Land Grantors VI*, 81 Fed.Cl. at 616. The hearing officer believed that requiring the claimants to produce a vendor affidavit would impose a minimal burden on the former landowners and their heirs because "the evidence in this reference indicates that a Vendor Affidavit appears to have been executed as part of all the 1942–1944 contracts." *Id.*

The claimants should not be required to produce an affidavit of vendor to receive a share of any recovery in this case. As addressed below, the hearing officer's conclusion that the claimants had a viable basis for recovery via the doctrine of mutual mistake was fatally flawed. Because the claimants' recovery could not be premised upon a theory of mutual mistake, the hearing officer's rationale for requiring an affidavit of vendor disappears. Additionally, requiring claimants to produce an affidavit of vendor would impose a significant hardship because many of the vendor affidavits can no longer be located, as they have been destroyed or no longer can be found due to the passage of time and the slipshod manner in which they were stored. Claimants' Opening Br. at 18–19.

In short, the hearing officer's conclusion that not all former landowners are entitled to share any recovery under the congressional reference was correct. Similarly, her ruling that those former landowners who sold their property to the government after a declaration of taking had been filed could nonetheless share in the recovery was not erroneous. However, the requirement that claimants necessarily had to produce an affidavit of vendor to join in any recovery was "clearly erroneous" because that requirement had its genesis in the mistaken premise that the claimants' recovery was based on a claim of mutual mistake.

## III. MUTUAL MISTAKE

A mutual mistake as to a material fact can lead to voidance or reformation of a contract. *See Restatement (Second) of Contracts*, introductory note to ch. 6, at 379 (1981). To succeed on a claim of mutual mistake the claimants must satisfy four factors: "(1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation". *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed.Cir.1990). The claimants must produce sufficient proof of each of the elements to satisfy the standard of "clear and convincing evidence." *National Austl. Bank v. United States*, 452 F.3d 1321, 1329–30 (Fed.Cir.2006) (citations omitted).

The hearing officer concluded that the claimants had a viable claim of mutual mistake, opining that "[t]he 'basic assumption' of fact on which the parties entered into contracts in 1942–1944 was that no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operation at the time of sale." *Land Grantors VI*, 81 Fed.Cl. at 602. The hearing officer found that the "effect [of the mistake] is most vividly evidenced by the difference between the $3,727,460 price paid for all of the land conveyed to the Government, compared with the lease and sale of coal, gas, oil, or other mineral rights, which yielded the government at least $34,303,980.42." *Id.* at 605. In determining whether "to allocate the risk of the mutual mistake" to the claimants, the hearing officer concluded that the former landowners and their heirs did not bear the risk because "even if a landowner may have wanted to

seek a neutral professional assessment of the potential for coal, gas, oil, and other minerals on his or her property, the time and exigencies of war made that both impracticable and impossible." *Id.* at 608.

The government asserts that the hearing officer's conclusion that the doctrine of mutual mistake was applicable to the facts of this case is erroneous "because (1)[c]laimants' delay in pursuing their rights prevents application of the doctrine; (2) the doctrine is legally inapplicable under these circumstances; and (3) the [o]fficer's findings with respect to each of the four elements of mutual mistake are based on clearly erroneous inferences, which are not supported by the existing record." Def.'s Opening Br. at 53–54. The government contends that the hearing officer considered mutual mistake "in terms of whether the parties were aware of the existence of minerals, [but] the only real 'mistake' the parties made was in failing to accurately predict that the sales prices in the 1960s would exceed the sales prices in the 1940s." *Id.* at 56.

For a party to state a viable claim for mutual mistake, he or she "must show that the parties to the contract held an erroneous belief as to an *existing* fact." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed.Cir.1994) (emphasis in original); *see also Restatement (Second) of Contracts* § 151 cmt. a ("[T]he erroneous belief must relate to the facts as they exist at the time of the making of the contract. A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a mistake as that word is defined here."). Thus, the Federal Circuit has observed that "there is uniformity among the circuit courts of appeals and the commentators that mutual mistake of fact cannot lie against a future event." *Dairyland Power*, 16 F.3d at 1203.

The evidence at trial indicates that the parties were generally aware at the time of sale that oil, gas, or coal might well exist under the properties. Oil and gas leases existed on some of the properties prior to the government's purchase of the properties, and the presence of commercially viable mineral reserves was known in the surrounding area. Furthermore, the hearing officer's application of the doctrine of mutual mistake was premised upon facts that arose some years after the government had acquired the property to construct Camp Breckinridge. *Land Grantors I*, 64 Fed.Cl. at 709. Each of these factors undercuts the application of the doctrine of mutual mistake to the sales that occurred during the early years of this country's participation in World War II. Based upon all of the evidence, the claimants cannot invoke the doctrine of mutual mistake because the parties were not mistaken about an existing fact.

## IV. MISREPRESENTATION

In the hearing officer's first interim report and memorandum opinion, she determined that "many of the landowners entered into [c]ontracts with the Government in 1942–1944 with the apparent understanding that they could repurchase their properties after World War II was concluded." *Land Grantors I*, 64 Fed.Cl. at 702. The hearing officer reached that conclusion after engaging in an extensive review of the pertinent evidence. *Id.* at 697–701 nn. 35–37. The hearing officer found support for her conclusion in affidavits dating largely from 1979 submitted by the claimants, depositions taken in this proceeding, and discovery responses. *Id.* Although there was some evidence suggesting that the government's purchasing agents were authorized to represent that the claimants would be permitted to reacquire their property, the hearing officer concluded that "[n]one of the government agents, employees, or representatives in 1942–1944 had authority to promise the landowners that they would receive preference to repurchase their property." *Land Grantors I*, 64 Fed.Cl. at 702.[17] As a consequence, the misrepresenta-

---

**17.** Amidst the extensive evidence of a repurchase promise, there is support for the proposition that the government authorized their employees and agents to make such representations. *Land Grantors I*, 64 Fed.Cl. at 670 n. 11. A former government negotiator, J. Sterling Towles, asserted that he "and other government negotiators were instructed by their superiors that if the property owners questioned whether or not they would be able to repurchase the property they were to be told that they would have the first option to repurchase the property after the war."

tion by the government's purchasing agents did not engender a legal claim, but rather gave rise to an equitable claim for relief.[18]

### A. *Evidentiary Issues*

The government's opening brief challenges the reliability of the evidence upon which the hearing officer relied in reaching her conclusion about the existence of a repurchase representation. Def.'s Opening Br. at 43–45. The government asserts that a stringent form of review is applicable to the hearing officer's factual findings in this context because her "evaluation of this evidence was not informed by live testimony." *Id.* at 46. The government contends that "[t]he [o]fficer's finding that many former owners ... would be entitled to repurchase their property after World War II is based on a handful of hearsay statements generated under largely unknown circumstances decades after the relevant events." *Id.* at 45. Additionally, the government claims that the hearing officer erred in relying on the 1979 affidavits because the affiant's statements are hearsay

---

CX 122 (Aff. of J. Sterling Towles (May 25, 1979)) at BLC 1298. Despite the assertions of Mr. Towles, the hearing officer concluded that "[n]one of the government agents, employees, or representatives in 1942–1944 had authority to promise the landowners that they would receive preference to repurchase their property after World War II." *Land Grantors I*, 64 Fed.Cl. at 702.

The only evidence that the government authorized its employees and agents to promise the former landowners the first option to repurchase their property comes from Mr. Towles' affidavit. Mr. Towles' affidavit thus stands in contrast to the great weight of the evidence which suggests that the repurchase representations were not authorized by the government. Furthermore, neither of the parties have challenged the hearing officer's conclusion that the repurchase promises were not authorized by the government. Therefore, the hearing officer's conclusion that the repurchase promise was unauthorized is accepted by the review panel.

**18.** The misrepresentations by government agents and employees concerning the ability of the former landowners to repurchase their properties give rise to an equitable claim against the government. "A contract with the United States ... requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States." *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997). Because the representations were made by individuals without the authority to do so, the repurchase promises were not a term of the sales contract between the government and the former landowners. Therefore, the claimants do not have a legal claim against the United States for breach of contract.

To possess a viable equitable claim in a congressional reference case, the claimants must demonstrate "that 'the government committed a negligent or wrongful act' and that 'this act caused damage to the claimant.'" *J.L. Simmons Co. v. United States*, 60 Fed Cl. 388, 394 (2004) (quoting *California Canners & Growers Ass'n v. United States*, 9 Cl.Ct. 774, 785 (1986)). It has become well-established that in congressional reference cases "when the government acquires benefits through the overreaching of its agents, when government officials act outside the scope of their authority, or when government actions have resulted in unjust enrichment" the claimants have a viable equitable claim against the government. *J.L. Simmons Co.*, 60 Fed Cl. at 394; *see also The Merchants Nat'l Bank of Mobile v. United States*, 7 Cl.Ct. 1, 9 n. 6 (1984). Here, the government employees and purchasing agents were not authorized to promise the former landowners the first option to repurchase their property. Despite the fact that the representations were unauthorized, the former landowners relied on the representations of the government employees and agents in deciding to sell their property to the government. Because the United States has not waived its sovereign immunity for claims seeking the remedy of specific performance, the former landowners were left without an effective way to enforce the repurchase promise. *See Richardson v. Morris*, 409 U.S. 464, 465, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973) (citing *United States v. Jones*, 131 U.S. 1, 9, 9 S.Ct. 669, 33 L.Ed. 90 (1889)). The lack of a mechanism to enforce the repurchase promised allowed the United States to reap the benefits of selling the former landowners' properties at auction in large blocks. This would not have been possible if the claimants exercised their right to repurchase their former property. Thus, the government was able to reap a benefit from the fact that its purchasing agents and employees acted outside the scope of their authority.

The unauthorized representation by government employees and purchase agents that the former landowners would have the first option to repurchase their land injured the former landowners by depriving them of a reasonable opportunity to reacquire their land from the government. *See Land Grantors I*, 64 Fed.Cl. at 665. The former landowners' inability to reacquire their property is a cognizable harm, especially given that under the law each parcel of land is unique. *See, e.g., United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir.1982) (stating that the uniqueness of land is "settled beyond the need for citation"). Thus, the claimants are able to satisfy the requirements necessary to have a compensable equitable claim against the government in a congressional reference case.

not within any applicable exception. *Id.* at 39–43. Thus, the government contends that the hearing officer's conclusion that the government agents and employees made representations regarding the ability of the former landowners to repurchase their land is "clearly erroneous." *See id.* at 45–46.

The hearing officer had extensive documentary evidence before her, not a mere "handful" of statements, to aid in rendering her decision. She considered a large number of affidavits executed roughly thirty years ago, well before this congressional reference was made, to support her conclusion that the government promised the former landowners a priority in repurchasing their land. *Land Grantors I*, 64 Fed.Cl. at 699–701 n. 36 (summarizing the contents of 49 affidavits that support the existence of a repurchase promise). The hearing officer admitted these affidavits under the residual hearsay exception set out at Fed.R.Evid. 807. The government claims that the hearing officer's decision to admit the affidavits was flawed because the admission of such hearsay statements undermines the purpose of the Federal Rules of Evidence, the government did not receive sufficient notice of the claimants' intention to utilize the affidavits, and the documents do not contain the necessary guarantees of trustworthiness. Def.'s Opening Br. at 39–43.

The evidentiary rulings of a trial court can be reversed by an appellate court only if they constitute "an abuse of discretion, and ... prejudiced substantial rights." *Applied Med. Res. Corp. v. United States Surgical Corp.*, 147 F.3d 1374, 1380 (Fed.Cir.1998). A reviewing court can "affirm the rulings of the lower court on any ground that finds support in the record, even where the lower court reached its conclusions from a different or even erroneous course of reasoning." *Keyes v. School Dist. No. 1*, 521 F.2d 465, 472–73 (10th Cir.1975). An appellate court will not disturb a trial court's "admission of evidence simply because the judge did not place his [or her] ruling on the ground that would most readily have supported it." *United States v. Ross*, 321 F.2d 61, 69 (2d Cir.1963).

### 1. Hearsay.

The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c). However, an out-of-court statement is not hearsay if it is offered to show effect on the hearer. *See* 2 Kenneth S. Brown, *McCormick on Evidence* § 249, at 134 (6th ed.2006). Along these lines, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R.Evid. 801, Advisory Committee Note to Subdivision (c), 1972 Proposed Rules.

Here, some of the statements were made in circumstances where they had the effect of suppressing objections by landowners. A prior federal employee of the engineering staff at Camp Breckinridge testified by deposition that he was physically proximate to, and heard, discussions between government purchasing agents and landowners:

Q. Were you in physical proximity or closeness to employees of the government who were involved in dealing with landowners regarding the acquisition of their real estate?

A. They—it's a complicated answer. If I was sitting—sitting about there (INDICATING), he was just on the other side of that wall there and there wasn't any door and I could hear everything he said.

Q. All right. And for how long were you in that proximity?

A. Approximately two weeks.

Q. And can you remember anything you heard the government land officer say?

A. The landowners, a whole bunch of them came in, and the landowners came in and they were irritated, and he, without fail, told them, "We need it; and if on any occasion we no longer need it, you'll be the first one to have the chance to get it back."

Q. And—

A. It was the standard line.

Q. All right. And how many—approximately how many times would you have heard that said?

A. Thirty times a day I think.

Q. For how many days?

A. About ten.

Q. So there were lots of landowners coming in and lots of meetings.

A. They were irritated.

Dep. of Herbert F. Hoffman 8:7 to 9:13 (July 21, 2004) ("Hoffman Dep."). This statement by the deponent "ha[s] an impermissible hearsay aspect as well as a permissible non-hearsay aspect." 2 *McCormick on Evidence* § 249, at 135. It is hearsay insofar as the landowners were told by the government's purchasing agent that "you'll be the first one to have the chance to get it back." Hoffman Dep. at 9:1–2. It is not hearsay insofar as it suppressed the landowners' objections and induced them to sell.[19]

*a. Depositions.*

As a general matter, the hearing officer found the deposition testimony to be admissible under the "[f]ormer testimony" exception to the hearsay rule. *Land Grantors I,* 64 Fed.Cl. at 700 n. 35. The government does not challenge the hearing officer's decision to admit the depositions under this hearsay exception.

*b. Affidavits.*

The affidavits pose different issues. Some were given by persons directly involved as sellers. *See, e.g.,* CX 197 at BLC 024 (Aff. of Jewell Duncan (Mar. 6, 1979)) ("The government appraisers told us that after the war when the camp was no longer needed we would have first chance to purchase our farm."); CX 219 at BLC 022 (Aff. of Henry V. Clements, Jr. (Mar. 7, 1979)) ("We were told by the government land appraisers, when this land was condemned for the camp, that we would get it back when the war was over for the same price we had been paid

for it by the government."). Other affidavits were given by persons present during the discussions between the government's agents and the pertinent landowners. *See, e.g.,* CX 205 at BLC 146–47 (Aff. of Lloyd H. Woodring (Mar. 2, 1979)) ("My dad, Ulliss [Woodring], and I sat with Pete West, the government negotiator, at the kitchen table negotiating the acceptance of the appraised value of the farm. Pete West, a friend of [d]ad, said 'you or your heirs will get the first chance to buy the land back at the same price less the damages. The government will only operate the camp four to six years.' "). These statements and numerous other affidavits setting out similar statements are manifestly hearsay.

The claimants offered the affidavits as "evidence of a material fact." Fed.R.Evid. 807(A). The affidavits were offered to prove that government employees and agents represented to the former landowners that they would have the first opportunity to repurchase their land. *See Land Grantors I,* 64 Fed.Cl. at 700 n. 36. The existence of the repurchase representation was one of the reasons why the Senate enacted this congressional reference. S. 794, § 2. The government does not challenge the conclusion that the affidavits were introduced into evidence to prove a material fact.

Rule 803(16) of the Federal Rules of Evidence provides that "[s]tatements in a document in existence twenty years or more the authenticity of which is established" are admissible as an exception to the general prohibition on hearsay evidence. Fed.R.Evid. 803(16). Unlike other exceptions to the hearsay rule, the exception for ancient documents "does not require an explicit showing of trustworthiness, nor does it contain a trustworthiness exclusionary clause." 4 Stephen A. Saltzburg, et al., *Federal Rules of Evidence Manual* 803.02[17] at 803–72 (9th ed.2006). This hearsay exception only requires a showing that the document containing the statement has been authenticated as

---

**19.** The Hoffman deposition was generally admissible under Fed.R.Evid. 804(a)(4) which provides an exception to the hearsay rule where the declarant "is unable to present or to testify at the hearing because of death or then existing physical or mental illness or infirmity". Fed.R.Evid.

804(a)(4). Mr. Hoffman was "almost 88" when he testified by deposition on July 21, 2004. Hoffman Dep. at 3:15. Mr. Hoffman was cross-examined by counsel for the government. His deposition was also videotaped.

an ancient document. *See, e.g., United States v. Mandycz,* 447 F.3d 951, 966 (6th Cir.2006) (upholding the admissibility of Soviet interrogation records over an objection that they were not authentic because "although Rule 901(b)(8) requires that the document be free of suspicion, that suspicion goes not to the content of the document, but rather to whether the document is what it purports to be"); *United States v. Kairys,* 782 F.2d 1374, 1379 (7th Cir.1986) ("Whether the contents of the document correctly identify the defendant goes to its weight and is a matter for the trier of fact; it is not relevant to the threshold determination of its admissibility."). The underlying basis of the "statements in ancient document" exception is that "the danger of mistake is minimized by authentication requirements, and age affords assurance that the writing antedates the present controversy." Fed.R.Evid. 803, Advisory Committee Note to ¶ 16, 1972 Proposed Rules.

Most of the affidavits were created in 1979, 25 years before they were introduced at trial. The government does not contend that the documents are not affidavits or that they have been altered since their creation.[20] The government's main objections to the hearing officer's determination that the affidavits had "equivalent circumstantial guarantees of trustworthiness" go more to the weight the hearing officer gave these documents in finding the existence of a repurchase promise than to their admissibility. When the trier of fact is a judge, not a jury, questions of weight are not particularly problematic. *See McQuown v. United States,* 199 Ct.Cl. 858, 870 (1972) (stating that "[a] large part of the purpose of the [hearsay] rule—the protection of jurors deemed impressionable—is lost in a trial conducted by a judge alone. In civil bench trials, therefore, many experienced judges admit hearsay they deem reasonably reliable and probative"), *implicitly overruled*

on other grounds by *Doe v. United States,* 372 F.3d 1347 (Fed.Cir.2004).

The government claims that the affidavits are unable to meet one of the underlying justifications for the ancient documents exception because "the affidavits were executed in an effort to recover a monetary award from Congress, [and therefore] there is a clear potential for bias." Def.'s Opening Br. at 41. However, many of the affiants addressed matters of which they had "participatory knowledge." *See Boston Edison Co. v. United States,* 64 Fed.Cl. 167, 182 (2005). They were therefore percipient witnesses as to the facts addressed. The government and the former landowners have had an ongoing dispute since 1942 over whether the landowners were appropriately compensated and over the sales tactics used by government agents and employees. *Land Grantors I,* 64 Fed.Cl. at 669–70. The hearing officer was well aware of that history and factored that background into her analysis of whether the affidavits qualified under the residual hearsay exception. *Id.* at 700 n. 36. Furthermore, the hearing officer addressed the government's concern in determining what weight to place on the affidavits. In short, the affidavits were admissible under the ancient documents exception embodied in Fed. R.Evid. 803(16), and the hearing officer adequately took into account the government's objections in deciding what evidentiary weight to give them.

The hearing officer explicitly relied on the residual hearsay exception in finding that the affidavits were admissible. *Land Grantors I,* 64 Fed.Cl. at 700 n. 36. The residual hearsay exception provides that

[a] statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B)

**20.** The majority contends that "there is no evidence that the authenticity of the affidavits was, in fact, established" and thus that Fed.R.Evid. 803(16) cannot be invoked to support admissibility. *See* majority op., *supra,* at 51 n. 4. That contention is far off the mark. There is not the slightest hint in the record that the affidavits were other than exactly what they purported to

be. They were generated as a result of a cooperative effort between the Breckinridge Land Committee and the Kentucky River Coalition, a nonprofit environmental organization, to preserve testimony of the affiants. *See supra,* at 54 & n. 8. The circumstances in which the affidavits were given thus has a detailed, unrefuted basis in the record.

the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 807. The residual hearsay exception was "not intended to confer 'a broad license' on trial judges 'to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b).'" *Conoco Inc. v. Dep't of Energy,* 99 F.3d 387, 392 (Fed.Cir.1997) (quoting S.Rep. No. 94–199, at 20 (1975)).

The government objects to the introduction of the affidavits under the residual hearsay exception because it claims they lack the "equivalent circumstantial guarantees of trustworthiness" required by the Federal Rules. Fed.R.Evid. 807. The government claims that the hearing officer's conclusion that the affidavits satisfy the trustworthiness requirement is flawed because it overlooked numerous problems with the information contained in the affidavits. Def.'s Opening Br. at 41–43. In determining whether a statement has sufficient "equivalent circumstantial guarantees of trustworthiness" under the residual hearsay exceptions, courts "compare the circumstances surrounding the statement to the closest hearsay exception." 2 Kenneth S. Broun, *McCormick on Evidence* § 324 at 405 (6th ed.2006); *see Conoco,* 99 F.3d at 393–94 (examining the similarities surrounding the creation and use of purchase summaries which the government sought to have admitted under the residual hearsay exception to the circumstances which support the trustworthiness of the business-records, market-reports, and commercial-publications hearsay exceptions).

In this respect, the affidavits recount similar experiences and corroborate each other, *see Land Grantors I,* 64 Fed.Cl. at 700 n. 36, and thus the applicability of the exception is supported. Moreover, the *entire* breadth of the evidence in the record respecting the repurchase representation is consistent with the affidavits. Evidence in the underlying historical record supports a finding that government employees and purchasing agents made representations to the former landowners about their ability to repurchase their home when it became surplus property. *See, e.g.,* JX 47 (Letter from Howard Greenberg, Commissioner, General Services Administration, to Congressman William H. Natcher (Feb. 5, 1965)) at DOJ 1535; DX 150 (Letter from Thomas L. Peyton, Chief, Disposal Branch, Real Property Disposal Division, to Fred I. King (July 5, 1951)) at DOJ 1508–09; JX 36 at DOJ 1500 (Letter from Senator Virgil M. Chapman to Robert D. Griggs, et. al. (Apr. 11, 1950)). Thus, the hearing officer did not err in admitting the affidavits because they were the most probative available evidence concerning the repurchase promise not contained in the historical record. *See* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* ¶ 807.3[3][a], at 807–24.3 to 807–24.4 (Joseph McLaughlin ed., 2d ed.2002) (stating that the "'more probative' requirement cannot be interpreted with cast iron rigidity").

The government relies on statements from the Supreme Court's decision in *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), in asserting that the hearing officer erred in considering other evidence in determining the trustworthiness of the affidavits. Def.'s Opening Br. at 40. The government's argument, however, overlooks that the holding in *Wright* was limited to determining what guarantees of trustworthiness were necessary to satisfy the Confrontation Clause of the Constitution applicable to criminal cases. *Wright,* 497 U.S. at 822, 110 S.Ct. 3139 (holding that "under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial"). After the Supreme Court's decision in *Wright,* lower courts evaluating the trust-

worthiness of hearsay statements sought to be admitted under the residual hearsay exception in civil cases have considered whether they are corroborated by other evidence. *See, e.g., United States v. Valdez–Soto,* 31 F.3d 1467, 1471 (9th Cir.1994); *Doe v. United States,* 976 F.2d 1071, 1079 (7th Cir.1992). Thus, the post-*Wright* precedents support the hearing officer's action in invoking the residual hearsay exception in this civil case based upon all of the evidence in the record of trial. The government is unable to show that the hearing officer's decision that the affidavits contained indications of trustworthiness was an abuse of her discretion.

The government claims that the affidavits lack the necessary probative value to satisfy the requirements of the residual hearsay exception. A statement is more likely to be admissible under the residual hearsay exception if the court concludes that little or no evidence would be available on the same point. *See, e.g., Conoco,* 99 F.3d at 394 (finding documents did not satisfy the probative value requirement when the government could "obtain from those three companies the underlying documents from which the summaries were prepared and evidence explaining how the underlying documents were prepared"). Here, as the government has acknowledged, the passage of time has resulted in a substantial loss of documents, through misplacement or destruction. Def.'s Opening Br. at 26. Furthermore, due to the delay in proceeding to trial, all of the affiants were deceased. *See id.* at 37. Thus, the affidavits were the most persuasive evidence that the claimants could produce to prove the existence of a repurchase promise after exerting "reasonable efforts." *See, e.g., Conoco,* 99 F.3d at 394 (finding that the purchase summaries the government sought to admit did not satisfy the probative value requirement because "DOE 'made no showing that reasonable efforts could not have produced' more probative evidence").

The government also asserts that the hearing officer erred in admitting the affidavits because reliance on "these hearsay statements" would contravene "the general purpose of the rules and the interests of justice." Def.'s Opening Br. at 40 (citing Fed.R.Evid. 807(C)). The government's argument is unavailing. The requirement in Federal Rule 807 that the government cites is a restatement of Rule 102. *See Robinson v. Shapiro,* 646 F.2d 734, 743 (2d Cir.1981).[21] In this case, the hearing officer's admission of the affidavits satisfies the requirements of Rule 102 because their admission increased the likelihood that the hearing officer would correctly resolve the factual dispute at issue. Furthermore, many courts have admitted evidence "that [is] relevant to prove material facts under the residual hearsay rule on the basis simply of their 'need ... plus adequate guarantees of trustworthiness.'" *Schering Corp. v. Pfizer, Inc.,* 189 F.3d 218, 238 (2d Cir.1999) (quoting *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway and Sons,* 523 F.2d 1331, 1341 (2d Cir.1975)); *see also United States v. Earles,* 113 F.3d 796, 801 (8th Cir.1997). In this case, the affidavits are helpful in resolving the central dispute in this case, and they satisfy all of the other requirements set forth in Fed.R.Evid. 807. Therefore, the government has failed to show the hearing officer abused her discretion in admitting the affidavits.

The government claims that it received insufficient notice of the claimants' intention to introduce the affidavits into evidence. Def.'s Opening Br. at 41. The government asserts that it received insufficient notice because "[c]laimants waited 25 years after the affidavits were signed (and 15 years after [c]laimants filed their complaint) before they provided the documents to the undersigned counsel shortly before trial." *Id.* The government's proposed ground for finding that it received insufficient notice is not supported. *See, e.g., United States v. Munoz,* 16 F.3d 1116, 1122 (11th Cir.1994) ("There is no particular form of notice required under the rule. As long as the party against whom the document is offered has notice of its existence and the proponent's intention to intro-

---

**21.** Federal Rule of Evidence 102 provides that judges shall interpret and apply the rules of evidence "to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Fed.R.Evid. 102.

duce it—and thus has an opportunity to counter it and protect himself against surprise—the rule's notice requirement is satisfied."). It is undisputed that the claimants provided the government with the affidavits in March 2004, six months before the start of the trial. *Land Grantors I,* 64 Fed.Cl. at 700 n. 36. In response to receiving the affidavits, the government retained two experts to rebut the affidavits. *Id.* Additionally, in August 2004, "the Government filed a [m]otion in [l]imine to exclude all of the [a]ffidavits of former landowners or their heirs" and devoted an extensive portion of its post-trial brief to explaining "why the affidavits should be excluded as hearsay or otherwise were unreliable information." *Id.* Furthermore, the government's claims are undermined by the failure of its counsel to use the discovery tools provided in the RCFC to seek out the affidavits and other such information during the long pendency of this case. For these reasons, the government's contention that it had inadequate notice is unavailing.[22]

Finally, the government objects to the admission of the affidavits on the ground that they were admitted after the trial had been completed. Def.'s Opening Br. at 37. However, the government's argument overlooks the fact that the hearing officer did not close the record at the end of trial. Indeed, both the government and the claimants continued to submit exhibits to the hearing officer in the months following the close of trial. *See, e.g.,* Def.'s Submission of Supplement Exhibit List (Dec. 10, 2004), Docket No. 148; Claimants' Motion Regarding Trial Exhibits (Dec. 10, 2004), Docket No. 149. The hearing officer's decision not to close the record after the end of the trial did not prejudice the United States because it had a full opportunity to respond and object to the inclusion of the affidavits in the record. *See, e.g.,* Response to the Court's Proposed Order Regarding Final Evidentiary Exhibits (Mar. 29,

2005), Docket No. 167; Def.'s Post–Trial Br. (Jan. 24, 2005), Docket No. 157; Def.'s Resp. to Claimants' Mot. Regarding Trial Exs. (Dec. 17, 2004), Docket No. 150. Both RCFC 1 [23] and Fed. R. of Evid. 102 allow judges the flexibility to structure procedures to ensure that they are fair and efficient. The hearing officer did not abuse her discretion by keeping the record open during post-trial briefing.

### c. Discovery responses.

The government also contends that the hearing officer's findings regarding misrepresentation cannot be based upon plaintiff's discovery responses. However, the discovery responses do not fall within the definition of hearsay because they are an "[a]dmission by party-opponent." Fed.R.Evid. 801(d)(2). And, remarkably, here it was the *government* which introduced the claimants' responses to the government's interrogatories into evidence. *See* DX 670 to DX 701 (Answers to Def.'s First Set of Interrogatories and Responses to Requests for Production of Documents (May 5, 2004)). The government's contention that the responses were based upon hearsay is simply not available in circumstances where the government itself was the party which sought the admission of the responses as evidence by way of a supplemental submission. *See* Def.'s Submission of Supplemental Exhibit List (Dec. 10, 2004). The government cannot assign error to action by the hearing officer that adopted a request it had made during the course of the evidentiary proceedings.

### B. The Repurchase Representation

The affidavits and depositions submitted by the claimants unequivocally establish that government employees and agents represented to the former landowners that they would be given the first opportunity to re-

---

**22.** The claimants assert that the affidavits are also admissible because they address "reputation as to events of general history important to the community or State or nation in which located." Fed.R.Evid. 803(20). The affidavits cannot be admitted under this hearsay exception because they are not reputation evidence, but rather are assertive statements of various individuals. 4 Stephen A. Saltzburg et al., *Federal Rules of Evidence Manual* § 803.02[21] at 803–78 (9th ed.

2006) ("[I]f the statement is a personal assertion of a single declarant, it will not be admitted under rule 803(20).").

**23.** RCFC 1 provides that the rules of this court "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." RCFC 1.

purchase their property. *See Land Grantors I*, 64 Fed.Cl. at 670 n. 11, 700–701 nn. 35–37 (summarizing the evidence supporting the existence of the repurchase promise). The affidavits relied on by the hearing officer establish that the former landowners "were verbally promised [their] farm[s] back when the government was through with [them]." CX 173 (Aff. of Hassie Tilly Adamson (Feb. 16, 1979)) at BLC 148; *see also* CX–232 (Aff. of Russell B. Babbs (Mar. 25, 1979)) at BLC 127 (stating that his family was told by the government purchasing agent "that when the war was over we could get a chance to buy the land back"); CX 148 (Aff. of Gerald E. Griggs (Mar. 8, 1979)) at BLC 86 (stating the former landowners "were promised that they could buy this land back when the war ended and Camp Breckinridge was no longer needed"); CX 197 (Aff. of Jewell Duncan (Mar. 6, 1979)) at BLC 24 (stating "[t]he government appraisers told us that after the war when the camp was no longer needed we would have [the] first chance to purchase our farm"); CX 144 (Aff. of E. Griggs Brooks and John L. Brooks Jr. (Feb. 23, 1979)) at BLC 90 (stating that the government purchasing agent promised that the property "would be sold back to [the] original owner"); CX 229 (Aff. of Marietta Tapp Chandler (Jan. 22, 1979)) at BLC 57 (stating her father believed "that when the war was over he would be given the first opportunity to purchase the land back"); CX 167 (Aff. of Clifton E. Blue (Sept. 21, 1978)) (stating that the former landowners "were told when the war was over we would get our land back at the same price paid less damages").[24]

The depositions of the claimants also support the conclusion that government employees and purchasing agents during negotiations with the former landowners represented that they would be given the first opportunity to repurchase their property. *See, e.g.*, Dep. of Lottie Mae Lynn 10:16–18, 16:9–12 (July 14, 1995) (stating that the government told her family that "we could

have [our land] back after the war was over"); Dep. of John Edwin Johnson 13:8–16 (Sept. 21, 2004) (stating that it was "fairly well-known throughout the community that, you know, they [the landowners] were going to get their farm back"); Dep. of Peyton Heady 7:68–70 (Oct. 1, 2004) (stating that while he worked as a clerk at Camp Breckinridge he was informed by a "land acquisition agent [these] farmers will get their land back after this camp is closed"); Hoffman Dep. 8:21 to 9:10 (stating that while working as an employee for Camp Breckinridge the government agents repeatedly told the former landowners that "if on any occasion we no longer need [your land], you'll be the first one to have the chance to get it back"); Dep. of Kathryn Pullum 9:17–20 (July 14, 1995) (stating that she heard a government representative "tell [her] husband that we would have [the] first chance to buy the land back when they were finished with it"); Dep. of William Caton 73:20 to 74:5 (July 14, 1995) (stating in response to the government's question about the existence of a repurchase promise "that they [government agents] stressed all the time that just as soon as the war is over and everything is over, why, you'll get this land back").[25]

The government has the burden of showing that the hearing officer's factual conclusion that government employees and agents represented to the plaintiffs that they would be given the first opportunity to repurchase their properties was "clearly erroneous." RCFC App. D, ¶ 8. The factual conclusions of the hearing officer are not to be disturbed upon appeal simply because the review panel "'might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the [trial judge] apparently deemed innocent.'" *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 857–58, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (quoting *United States v. National*

---

24. For a complete list of all the affidavits and the statements contained in the affidavits that support the finding of a repurchase promise, *see Land Grantors I*, 64 Fed.Cl. at 700 n. 36.

25. For a complete summary of the deposition testimony that supports the existence of a repur-

chase promise, *see Land Grantors I*, 64 Fed.Cl. at 700 n. 35. For a summary of the discovery responses that also support the finding that government agents made repurchase promises to the landowners, *see Land Grantors I*, 64 Fed.Cl. at 700 n. 37.

*Ass'n of Real Estate Bds.*, 339 U.S. 485, 495, 70 S.Ct. 711, 94 L.Ed. 1007 (1950)). The government brought the problems it identified with the claimants' evidence to the attention of the hearing officer, and she found that those problems did not significantly undermine the credibility of those documents. *See Land Grantors I*, 64 Fed.Cl. at 700 n. 36. In its briefs, the government raises the same infirmities with the evidence that the hearing officer considered and found unavailing. Thus, the basis of the government's objection to the hearing officer's factual conclusion about a repurchase promise asks the review panel to do what it cannot do: substitute its judgment for that of the hearing officer.

In reviewing the record, the extensive evidence indicating that the government made a repurchase representation is sufficient to overcome any shortcomings that may exist in any one particular document that resides within the body of materials. The inconsistencies cited by the government do not relate to the existence of a repurchase promise itself, but instead to surrounding details about the terms of that representation or the circumstances in which it was made in individual instances. Furthermore, evidence showing the widespread knowledge of a repurchase promise made by government employees and agents supports the trustworthiness of the finding. *See* Advisory Committee Note to Fed.R.Evid. 803 (19–21) (stating that trustworthiness can be "found 'when the topic is such that the facts are likely to have been inquired about and that persons having personal knowledge have disclosed facts which have thus been discussed in the community; and thus the community's conclusion, if any has been formed, is likely to be a trustworthy one' "). The government's contentions are insufficient to sustain its burden of establishing that the hearing officer's factual findings are "clearly erroneous," especially in light of the fact that "the [review] panel must take that view of the evidence and the inferences deducible therefrom in a light which is most favorable to plaintiff." *The Merchants Nat'l Bank of Mobile*, 7 Cl. Ct. at 7.

The government asserts that the evidence relied upon by the hearing officer cannot support her findings because "many affiants . . . [had] no personal knowledge of the relevant events." Def.'s Opening Br. at 43. However, the government's challenge on the basis of personal knowledge is unavailing. Many of the individuals that submitted affidavits and depositions to which the government objects had "participatory knowledge" of the events surrounding the government's acquisition of the properties that comprised Camp Breckinridge, as they were heirs of the former landowners who had heard conversations between their family members and government agents, as well as being informed of the government's acquisition of Camp Breckinridge from first-hand participants. *See Boston Edison*, 64 Fed.Cl. at 182. In addition, by the time of trial, the passage of years meant that virtually all of the affiants were unavailable to testify personally. One of the leading treatises on evidence law has stated that "it would usually be impossible to prove personal knowledge after [a] lapse of 20 years or more." Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.18, at 803–118.3 (Joseph McLaughlin ed., 2d ed.2002).

## V. REMEDY

The hearing officer determined that the former landowners and their heirs were entitled to receive $34,303,980.42 from the United States in restitution. *Land Grantors VI*, 81 Fed.Cl. at 611. The amount in restitution recommended by the hearing officer was that which the government received from selling and leasing the mineral reserves that existed underneath the former landowners' property. *See Land Grantors I*, 64 Fed.Cl. at 665 & n. 4. In calculating the amount, the hearing officer excluded the claimants' estimate of royalties the government received from four properties because the estimates provided by their expert witness were "not reasonably certain." *Land Grantors VI*, 81 Fed.Cl. at 611–12. The hearing officer calculated that the United States received an additional benefit of $91,709,844.54, which represented the savings it realized from not having to service the national debt because of the revenues received from the former landowners' properties, but she determined that the United States was not required to compensate the

claimants for this benefit. *Land Grantors VI*, 81 Fed.Cl. at 616–17. The hearing officer proposed that any monetary recovery be made available to the claimants "in proportion to [their] former ownership interest in the original tracts." *Id.* at 617.

Calculating the amount of recovery the claimants are entitled to receive in this case was made more difficult than usual because "the Government failed to produce or [had] destroyed relevant documents that would verify the correct amount." *Land Grantors VI*, 81 Fed.Cl. at 616. In this respect, the government's counsel acknowledged that the record in this case contains minimal documentation concerning the eventual disposition of these properties. Def.'s Resp. to the Court, Attach. A (E-mail from William Shapiro to Judge Braden (Mar. 4, 2005)) at 1. The relative lack of documentation does not preclude claimants' recovery; "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001).

The manner in which the hearing officer calculated the remedy and planned to distribute any award was equivalent to a so-called "fluid recovery." The possibility of such a recovery in class actions has recently attracted considerable attention in suits brought under the Racketeer Influenced and Corrupt Organizations Act against cigarette manufacturers for their marketing of "light" cigarettes. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir.2008). Courts have used the concept of a "fluid recovery" to describe a range of proposed remedies. *See Schwab v. Philip Morris USA, Inc.*, No. CV 04–1945, 2005 WL 3032556, at *1 (E.D.N.Y.2005) ("Recoveries described as 'fluid' include distribution of damages through price reductions rather than by cash to individual plaintiffs; distribution of settlement or damage funds left unclaimed by individuals to nonprofit organizations or to states for uses intended to benefit class members; and distribution of damages calculated on a classwide basis to individual plaintiffs or through various indirect means." (internal citations omitted)). The hearing officer's proposed remedy is appropriately classified as a fluid recovery because she calculated the benefit to the United States by looking at the revenue it received from selling and leasing all of the mineral rights, regardless of how the government acquired the property, and then proposing to distribute any award to the claimants in accord with their ownership interest in Camp Breckinridge. This methodology would result in individuals receiving compensation irrespective of the exact amount of benefit each claimant bestowed on the government. *Land Grantors VI*, 81 Fed.Cl. at 616–17.

Federal courts that have confronted the use of fluid recoveries in class action litigation have found that they are impermissible. *See, e.g., McLaughlin*, 522 F.3d at 231–32; *In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir.1974).[26] These courts have concluded that fluid recoveries run afoul of the Rules Enabling Act and the Due Process Clause of the Constitution. *McLaughlin*, 522 F.3d at 231–32. Courts have invoked the Rules Enabling Act because a fluid recovery "would inevitably alter defendants' substantive right to pay damages reflective of their actual liability," possibly requiring the defendant to "overcompensat[e] individual plaintiffs" and to "overpay[ ] in the aggregate." *Id.* (internal citations omitted). Use of a fluid recovery has been found to contravene the Due Process Clause of the Constitution "when [it] is used . . . to mask the prevalence of individual issues," thus undermining "the right of defendants to challenge the allegations of individual plaintiffs." *Id.* at 232. In this instance, however, the hearing officer's use of fluid recovery would not circumvent the requirements for class certification in the Federal Rules of Civil Procedure, nor did it prevent the government from mounting a vigorous defense against the claimants' alle-

---

**26.** The leading treatise on class actions notes, however, that "even in circuits that have ruled that cypres or fluid class recovery distributions are not valid in contested adjudications, these distributions have obtained a stamp of approval as part of a class settlement." 4 *Newberg on Class Actions* § 11.20 (4th ed.2002).

gations. Nonetheless, implementing the hearing officer's remedial scheme would be inappropriate since it might conceptually overcompensate individual claimants and thus run afoul of the concerns expressed about the interplay of overcompensation and the Rules Enabling Act. *See McLaughlin,* 522 F.3d at 231. A more precise determination of damages is thus necessary. Fortunately, the record contains sufficient evidence to enable a satisfactory computation of damages.

Determining the appropriate amount of the claimants' monetary recovery requires a specific identification of the date when an actionable claim against the United States arose. The actionable claim against the United States arises from the misrepresentations made by government agents and employees concerning the former landowners' ability to have the first option to repurchase their land. However, the misrepresentation engendered only a nascent and inchoate claim. That claim matured against the United States only when the government declared Camp Breckinridge surplus property and sought to dispose of the property at public auction.

During the fall of 1962, in accord with the statutory directives governing the disposal of surplus property, the Department of Defense provided the House and Senate Armed Services Committees with a report indicating its intention to declare Camp Breckinridge to be surplus property and to dispose of it in accordance with the Federal Property and Administrative Services Act of 1949. *Land Grantors I,* 64 Fed.Cl. at 677. In December 1962, the Department of Defense obtained Congressional approval for its decision to declare Camp Breckinridge surplus property. *Id.* Following the receipt of Congressional approval, the Department of Defense "issued a Report of Excess Real Property that was forwarded to GSA for implementation." *Id.* Despite being declared surplus property late in 1962, the General Services Administration did not begin to conduct auctions of the mineral reserves or surface rights until 1965. *Id.* at 682–83. The delay in implementing the Department of Defense's directive stemmed from the fact that General Services Administration needed to wait for the revocation of Public Land Order Number 729, which was contingent upon "the Department of [the] Army report[ing] to the GSA that the remaining was excess property," before it could conduct any auctions. *Id.* at 682. Thus, the claimants first possessed an actionable claim against the United States in 1965, when the government had declared Camp Breckinridge surplus property and placed their former property up for auction.

The claimants' entitlement to relief in this case is premised upon an equitable claim, and thus the basis of the claimants' monetary recovery in this case is restitution. Restitution is appropriate when "[a] person ... has been unjustly enriched at the expense of another." *Restatement of Restitution* § 1 (1937); *see also Atlantic Coast Line R.R. v. Florida,* 295 U.S. 301, 309, 55 S.Ct. 713, 79 L.Ed. 1451 (1935) (stating that restitution is an appropriate remedy when a benefit is "received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it"). In addition to serving as a remedy for unjust enrichment, restitution can serve as an alternative remedy for a tort. *See FDIC v. Bank One, Waukesha,* 881 F.2d 390, 392 (7th Cir. 1989). In choosing a restitutionary remedy, the plaintiff seeks to recover the defendant's gain instead of his or her loss. *See, e.g., Glendale Federal Bank, FSB v. United States,* 239 F.3d 1374, 1380–81 (Fed.Cir. 2001); *see also Restatement of Restitution* § 1, cmt. d.

The key to determining the appropriate amount of recovery in cases involving restitution is the culpability of the defendant. *Restatement of Restitution* §§ 150–155, 202–204; *Restatement (Third) of Restitution and Unjust Enrichment* § 49(3) (Tentative Draft No. 5, 2007). The draft *Restatement (Third) of Restitution and Unjust Enrichment* provides that "[l]iability in restitution is measured differently in cases involving innocent recipients, conscious and unconscious wrongdoers, and nonwrongdoers who nevertheless bear responsibility for their own unjust enrichment." *Restatement (Third) of Restitution and Unjust Enrichment* § 49(3) (Tentative Draft No. 5, 2007) (internal citations omitted). The draft *Restatement of Restitu-*

tion states that "a 'wrongdoer' is a person unjustly enriched as a result of fraud, duress, undue influence, opportunistic breach, or actionable wrong to the claimant, without regard to notice or fault; while a 'conscious wrongdoer' is one who acts with knowledge or reason to know of the underlying wrong." *Id.* at § 51(1). An individual is to be placed in the latter category of culpability set forth in the draft Restatement of Restitution if he or she acted without due care, breached or repudiated an enforceable or unenforceable contract with the claimant, or acted in bad faith or engaged in "otherwise reprehensible conduct." *Id.* at § 52(1)(a-c) (Tentative Draft No. 5, 2007). In contrast, an innocent recipient is one who does not fall within any category of culpability. *Id.* at § 50(1).

The government's actions in this instance require that it be classified as a wrongdoer that bears responsibility for its own unjust enrichment. The government's liability to the claimants arises from the fact that its agents and employees orally represented to the former landowners that they would have the first opportunity to repurchase their property. During the acquisition of the land needed to construct Camp Breckinridge the government became "concerned [that] ... high pressure methods had been used to persuade some owners to sell." *Land Grantors I,* 64 Fed.Cl. at 670. The government bears responsibility for the actions of its agents and employees in negotiating with the former landowners. The government's failure properly to monitor the statements made by its agents and employees allowed them to make unauthorized representations regarding the ability of the former landowners to reacquire their property. Such failure appropriately to monitor the activities of its employees and agents is inexcusable given that the government was aware of the potential abuses occurring in the acquisition process. Thus, the government is not merely an innocent bystander to the overreaching of its employees and agents. The government's failure to exercise due care in properly monitoring the activities of its agents and employees requires that it bear responsibility for the unjust enrichment that resulted from the acquisition of the former landowners' properties.

Because a restitutionary remedy in the circumstances focuses on the benefit received by the defendant, it is necessary to value the benefit the government has received. *Glendale Federal Bank,* 239 F.3d at 1381. In cases where the benefit received originates from the receipt of money, "[t]he measure of enrichment ... is the consequent increase in the net assets of the person enriched." *Restatement (Third) of Restitution and Unjust Enrichment* § 49(1) (Tentative Draft No. 5, 2007). When a defendant initially receives a non-monetary benefit and later "exchanges it for money, he may be under a duty of restitution for the money thus received." *Restatement of Restitution* § 150 cmt. b. If the non-monetary benefit is not subsequently converted into "a money payment," the draft of the *Restatement of Restitution* provides four potential methods of valuation: "(a) the value of the benefit in advancing the purposes of the recipient; (b) the cost to the claimant of conferring the benefit; (c) the market value of the benefit; or (d) a price fixed by agreement between the claimant and the recipient." *Restatement (Third) of Restitution and Unjust Enrichment* § 49(2) (Tentative Draft No. 5, 2007). In determining which of these potential alternative measures to apply in a particular factual situation, it is important to be mindful that "restitution should be measured to reflect the substantive law purpose that calls for restitution." Dan Dobbs, 1 *Law of Remedies* § 4.5(1) at 629 (2d ed.1993).

The claimants are entitled to receive a share of the government's profits from its disposition of the mineral rights and land at issue in this case. The government's conduct prevents reliance on an alternative measure of recovery, namely the price at which the government acquired the former landowners' properties, which would not fully compensate the claimants for their losses. The claimants are entitled to receive a portion of the government's receipts because the government's inattentiveness to monitoring the activities of its employees and agents, despite knowledge of potential overreaching, adversely affected the acquisition process. *See Restatement (Third) of Restitution and Unjust Enrichment* § 52(2) (Tentative Draft No. 5, 2007).

The government acquired the 35,684.99 acres of land that comprised Camp Breckinridge for approximately $3,107,341 between 1942 and 1944. *Land Grantors I,* 64 Fed.Cl. at 664. The government acquired 10,375.21 acres through jury proceedings and paid $1,103,585.75 for those properties. CX 81 (Summary of Cases Tried to Jury). Because those individuals who had their land acquired through jury proceedings are excluded from recovery under the terms of the congressional reference, the revenues attributable to their land have to be excluded from any recovery. The hearing officer erred in calculating her proposed award by failing to take into account that not all of the land the government acquired could be considered in determining the government's benefit from the underlying transaction. Reducing the amount of any monetary award to account for the ineligibility of some former landowners to participate in any recovery is necessary to prevent the eligible claimants from reaping a windfall.

The government acquired 29.07% of Camp Breckinridge through judicial condemnation culminating in jury proceedings, and the land that was acquired using that process accounted for $10,862,474.04 of the hearing officer's restitutionary award. *See* Pls.' Ex.App. in Response to the Court's Dec. 15, 2005 Order and Comprehensively Summarizing Mineral Sale Proceeds, Ex. A–3 (listing the amount of revenue attributable to each parcel of land).[27] Additionally, the hearing officer erred by not excluding an additional $471,477.54 the government received in revenue from coal leases on condemned properties. Thus, the hearing officer overstated the award to the claimants by $11,333,951.58. After reviewing the individual amount of the government's proceeds that are attributable to each parcel of property that comprised Camp Breckinridge, the award to claimants should be reduced to $22,970,028.84. Such a monetary award should be distributed to the individual claimants in accord with the amounts attributable to each parcel of land as set forth in Exhibit A–3 of the Plaintiff's Exhibit Appendix. *See*

Pls.' Ex.App. in Response to the Court's Dec. 15, 2005 Order and Comprehensively Summarizing Mineral Sale Proceeds, Ex. A–3.

As a result, it is unnecessary in this case to rely on a "fluid recovery" or any mode of restitution that bears earmarks of such a recovery. Evidence in the record enables computation of an award that can be allocated among the eligible claimants on an individual basis in full compliance with the requirement in the congressional reference that Congress be informed "of the amount, if any, legally or equitably due from the United States to the claimants individually." S. Res. 98, 103d Cong. (1993).

The claimants contend that they are entitled to receive interest on any monetary award that they may receive in this case. Claimants' Opening Br. at 5. The claimants assert that the failure of any monetary award to incorporate an interest component would undermine the purpose of restitution because the government thus would be able to profit from its wrongdoing. *Id.* at 5–7. The claimants additionally maintain that the applicable amount of interest owed to them should be calculated using a compound interest rate because they aver that any award to them which does not calculate interest using a compound rate "understate[s] the benefit to the [g]overnment." *Id.* at 10. In support of their argument that they are entitled to compound interest, the claimants rely on the fact that compound interest is used in other settings to calculate the amount of a monetary award. *Id.* at 11. Utilizing the compound interest rate proposed by the claimants would result in the government owing the former landowners and their heirs more than $440 million in interest. *Id.* at 10.

It is well-established that to recover interest against the United States the claimants must invoke a specific waiver of sovereign immunity applicable to interest that is in addition to the waiver that is needed to sue the United States in the first instance. *See, e.g.,* 28 U.S.C. § 2516(a) (providing that "[i]nterest on a claim against the United States

---

**27.** In this same vein, the claimants' contention that the hearing officer erred by not including revenues for tracts 7A and 7B for a 21–year period is misplaced because the government ac-

quired those two tracts entirely by judicial condemnation. *See* CX 81 (Summary of Cases Tried to Jury).

shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof"); *see also Doyle v. United States,* 931 F.2d 1546, 1550 (Fed.Cir. 1991). Thus, "in the absence of a clear, explicit waiver of sovereign immunity from liability for interest, the United States government ... pays all judgments and amounts due in what economists call 'nominal dollars' rather than in economic 'real dollars.' " *Sandstrom v. Principi,* 358 F.3d 1376, 1377 (Fed. Cir.2004).[28] In the absence of an explicit Congressional waiver of the United States' sovereign immunity against interest on monetary awards, "the Supreme Court has held [that] only the Fifth Amendment of the Constitution ... mandate[s] the payment of interest." *United States Shoe Corp. v. United States,* 296 F.3d 1378, 1383 (Fed.Cir.2002) (citing *Library of Congress v. Shaw,* 478 U.S. 310, 317 n. 5, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986); *Smyth v. United States,* 302 U.S. 329, 353–54, 58 S.Ct. 248, 82 L.Ed. 294 (1937); *Boston Sand & Gravel Co. v. United States,* 278 U.S. 41, 47, 49, 49 S.Ct. 52, 73 L.Ed. 170 (1928)). The rules governing the liability of the United States are not altered simply because this is a congressional reference case. *See, e.g., United States ex rel. Angarica v. Bayard,* 127 U.S. 251, 260, 8 S.Ct. 1156, 32 L.Ed. 159 (1888) (stating that awards of interest are not allowed against the United States "whether they arise in the ordinary business of administration or under private acts of relief, passed by Congress on special application"); *Estate of Braude v. United States,* 38 Fed.Cl. 476, 487 (1997) (stating that "interest is permitted in congressional reference cases only when a statute waives the government's sovereign immunity against interest on the particular category of damages found"). The enactment of a congressional reference that provides for "full satisfaction of all claims ... against the United States" is insufficient to constitute a waiver of sovereign immunity which would allow this court to require the United States to pay interest on any potential award. *See J.L. Simmons Co.,* 60 Fed.Cl. at 399 (stating that the language of a congressional reference is "not positive law that supports either a legal or equitable claim.").

In the circumstances of this case, the principles of restitution conflict with the rules governing the liability of the United States for interest. Unfortunately for the claimants, the sovereign immunity of the United States prevails in such a conflict. Thus, for the claimants to receive interest on any potential award against the United States they need to demonstrate that Congress has waived the United States' sovereign immunity from paying interest on monetary judgments, and they are not able to make such a showing.

In their briefs, the claimants rely heavily on the fact that interest is awardable against the United States in takings cases under the Fifth Amendment. *See* Claimants' Opening Br. at 11–13. The claimants' reliance on the award of interest in takings cases is misplaced because the claimants' right to receive a monetary award arises from their equitable claim based upon misrepresentation by governmental agents and employees and not on a taking under the Fifth Amendment. The claimants also point to the Ninth Circuit's decision in *United States v. $277,000 U.S. Currency,* 69 F.3d 1491 (9th Cir.1995), as supporting their claim for interest. In *$277,000 U.S. Currency,* the Ninth Circuit confronted the issue of whether interest was awardable to a claimant during the time the United States wrongfully had possession over his money in the context of an asset forfeiture. 69 F.3d at 1492. The Ninth Circuit concluded that the individual did have a right to receive interest from the federal government during the time it had possession of the money because disgorgement is appropriate where "the government has profited from use of the property, especially where it has (actually or constructively) earned interest on money." *Id.*[29] The Ninth Circuit's decision

---

28. As the Federal Circuit has explained, "[n]ominal dollars retain their *number* over time," whereas "real dollars retain their *value*" by accounting for the effects of inflation. *Sandstrom,* 358 F.3d at 1377 n. 1 (emphasis in original).

29. The Ninth Circuit's adoption of an asset-for-feiture exception to sovereign immunity has been rejected by other circuit courts that have considered its rationale because "[s]overeign immunity does not depend upon whether the government

does not bolster the claimant's argument that they are entitled to receive interest. The decision in *$277,000 U.S. Currency* arose out of a situation where the United States exacted a forfeiture but ultimately lacked the authority to seize the property and was forced to return the property to its owner. *See* 69 F.3d at 1492. The rationale that the Ninth Circuit employed in reaching its result has only been employed in asset forfeitures and is not a general exception to sovereign immunity's no interest rule. *See Smith v. Principi*, 281 F.3d 1384, 1388 (Fed.Cir.2002). The facts underlying this case stand in stark contrast to the asset forfeiture cases which have rested upon the Ninth Circuit's theory. Thus, any monetary award the claimants may receive is not required to have an interest component.[30]

In sum, Congress should appropriate $22,970,028.84 to compensate the claimants for their claims stemming from the repurchase representations made by government employees and agents in acquiring the property necessary to construct Camp Breckinridge. The monetary awards to the individual claimants should be distributed in proportion to the revenues attributable to each tract of land that was acquired by the government outside the judicial condemnation process, as set out in Pls.' Ex.App. in Response to the Court's Dec. 15, 2005 Order and Comprehensively Summarizing Mineral Sale Proceeds, Ex. A–3. The claimants are not entitled to receive any interest because they are unable to demonstrate that the United States has waived its sovereign immunity in that regard.

## CONCLUSION

The claimants have stated a viable equitable claim that entitles them to relief from the United States. That claim rests upon the representations made by government agents and employees that the former landowners

would have the first right to reacquire their land. The evidence adduced in the case strongly supports the hearing officer's finding that government agents and employees in fact made oral representations to former landowners that they would be given the first opportunity to repurchase their property. In addition, the former landowners assiduously pursued their claims through petitions to executive departmental officials, litigation, and petitions to Congress, and there is no valid basis to apply the equitable defense of laches to bar their claim, contrary to the majority's ruling. For these reasons, I dissent from the majority's proposed disposition of this case and respectfully recommend that Congress appropriate $22,970,028.84 to compensate the former landowners for their claim against the United States. This is truly a case in which "the government [has] acquire[d] benefits through the overreaching of its agents," *J.L. Simmons Co.*, 60 Fed.Cl. at 394, and the claimants deserve recompense.

benefitted from its conduct in question." *United States v. $7,990 in Currency*, 170 F.3d 843, 845 (8th Cir.1999). It is not necessary to the disposition of this case to decide which of these competing approaches is correct.

**30.** If Congress were to be inclined to award the claimants interest on any recovery it might de-

cide to award, the appropriate rate to calculate the amount of interest owed would be 7.5%. CX 1 (Decl. of Dr. Charles Haywood (July 21, 2004)) at 3. The 43–year delay in receiving compensation coupled with 7.5% simple interest means the claimants would be entitled to receive $74,078,342.04 in simple interest.